**Jessie Lee SMITH**

v.

**Vol S. DOOLEY et al.**

**Civ. A. No. 83-0228.**

United States District Court,
W.D. Louisiana,
Shreveport Division.

July 23, 1984.

Henry C. Walker, Laurie W. Lyons, Shreveport, La., for plaintiff.

Sydney B. Nelson, John Layne Hammons, Shreveport, La., for defendants.

## MEMORANDUM OPINION

STAGG, Chief Judge

### I. INTRODUCTION:

This action was instituted by Jessie Lee Smith with allegations that his constitution-

al rights were violated, and that he was entitled to compensatory and punitive damages, and attorney's fees under the provisions of 42 U.S.C. §§ 1983 and 1988. Smith also alleged that he was entitled to relief under Louisiana tort law. A three-day bench trial was conducted on June 13–15, 1984, during which extensive testimony was adduced from the defendant deputies, the plaintiff, jail inmates and expert witnesses. This court's findings of fact and conclusions of law are set forth below as required by Rule 52(a), Federal Rules of Civil Procedure.

## II. FINDINGS OF FACT:

### A. Prologue

In January 1982, Jessie Lee Smith was incarcerated at the Bossier Parish Jail, which is located on the fifth floor of the Parish court house at Benton, Louisiana. He had been convicted of armed robbery, and his conviction recently had been affirmed on appeal.

Defendant Vol S. Dooley was the sheriff of Bossier Parish, and the following defendants were deputies employed by Dooley: J.W. Hollis; Larry Sherrill; Cecil Godwin; Jerry Carter; and Mert Pilkinton. Hollis was the jail supervisor, and Sherrill was the jailer. Godwin was the jail transportation officer. At the time of the incident involved in this case, Carter was on duty to help Godwin transport prisoners, and Pilkinton was the shift supervisor. A sixth deputy, Rick Ramey, was involved in the incident at issue in this case, but he is now deceased.

### B. Scene One: Maximum Security Cell No. 3

At approximately 4:00–4:30 O'Clock A.M. on January 19, 1982, the plaintiff was awakened by Deputy Sherrill and informed that he was being transported from the parish jail. Smith testified that he asked where he was being taken, and that Sherrill would not tell him. Sherrill asserted that he told Smith he was "going south," and that Smith replied, "I'm thinking about not going." Sherrill testified that he had a teletype message from the Louisiana Department of Corrections but that he did not

show it to Smith. Godwin was accompanying Sherrill when he awakened Smith, and testified that Smith refused to leave his cell.

Following Smith's refusal to move, Sherrill called his shift supervisor, Deputy Pilkinton. Shortly thereafter, Deputy Carter arrived in the area of Smith's cell, which was known as "Maximum 3." Carter was acquainted with Smith, and he testified that he told Smith he had to go because "they had orders." Carter stated that Smith again refused to leave, and that Smith said he "was worried he wouldn't make it down there." It is apparent from the testimony that Smith and several other prisoners were to be transported to Hunt Correctional Institute that morning.

At this point, there is some confusion as to when the additional defendant deputies arrived in the vicinity of Maximum 3. In response to Sherrill's call, Deputy Pilkinton arrived at the jail. Additionally, Deputy Ramey was called in because of the chance of trouble in removing Smith from his cell. Pilkinton testified that he spoke with Smith both inside Maximum 3 and from the catwalk outside the cell. He stated that Smith again refused to leave his cell, and that he never showed Smith the transportation message from the Department of Corrections. Pilkinton testified that Smith never asked to see the transportation papers.

Following his conversations with Sherrill, Carter and Pilkinton, which lasted about 30 minutes, Smith asked to see Capt. Hollis, the jail supervisor. Hollis lived only two blocks from the parish jail, and Pilkinton called him and informed him of the problems being encountered with Smith. Hollis testified that it took him 15 to 20 minutes to get to the jail from his residence. When he arrived at the jail, Hollis instructed the other deputies to get their night sticks in case of trouble, and went to see Smith in Maximum 3. Hollis testified that Smith told him that he didn't understand why he was being moved, but that he told Smith he had written orders requiring the move. Hollis testified that at this point someone brought the teletype orders to him, and

that he showed those orders to Smith. Smith testified that he never was shown the teletype message. Hollis stated that Smith told him, "I don't think I'm going to go."

After talking to Smith for several more minutes, Hollis left Maximum 3 and ordered Smith's two cell mates, inmates Tomley and Gaskin, out of Maximum 3, and into another cell. Hollis then ordered Carter and Pilkinton to "get him out."

Carter was the first deputy into the cell, and he was followed immediately by Pilkinton. Carter told Smith again that he had to leave and reached out to take him by the arm. At this point, Smith raised his right hand and struck Carter with a money clip which had a small pen-knife blade measuring one to one and a half inch in length. Carter exclaimed that Smith had a weapon, at which time Pilkinton sprayed Smith with a chemical known as "Chemshield." Carter, Pilkinton and Smith became embroiled in a violent struggle. At least one other officer, Deputy Ramey, entered the cell and also became involved in the altercation. During the struggle, Ramey received a cut between two fingers on his right hand. When Carter and Pilkinton grabbed Smith, they all fell to the floor of the cell, where the deputies were grappling with the plaintiff in an attempt to get the money clip out of his possession. Pilkinton received an abrasion on his stomach, and Carter's shirt was torn in several places. It is apparent from the testimony of several witnesses that at least some of the tears on the deputies' shirts were caused by the money clip's knife blade.

Subsequently, Smith was disarmed, subdued and handcuffed behind his back by the deputies. Inmates Jimmy Ray White and Jimmy Lee Richardson were housed in Maximum 4 next door to Smith's cell. They testified that they were able to see the events which transpired in Smith's cell from two vantage points: reflections in the windows and off the walls of the catwalk; and through a small peep hole drilled in the steel wall between Maximum 3 and Maximum 4. Although it must be concluded that White's and Richardson's view of the altercation in Maximum 3 was extremely limited, their testimony as to the events *inside* the cell do not materially deviate from the defendants' testimony. All of the witnesses who viewed some or all of the actual struggle inside Maximum 3 stated that once the deputies engaged Smith, they all fell to the 3 stated that once the deputies engaged Smith, they all fell to the floor only one time. White testified that he saw the deputies strike Smith with a night stick inside Maximum 3; however, Richardson stated that he saw no night sticks from his vantage point. Both inmates testified that the deputies subdued Smith once they got him to the floor of his cell, and that Smith's resistance to the officers ended inside the cell. Richardson summarized this observation as follows: "He lost the fight in the cell." Subsequent testimony by jail personnel concerning the physical circumstances of the cells and windows make it doubtful that credence should be given to the testimony of White and Richardson.

Each of the defendant deputies testified that every deputy involved in the incident wore a uniform, with the exception of Deputy Hollis, who routinely wore civilian clothes. Every inmate witness, including the plaintiff, testified that at least one individual involved in the struggle, had on civilian clothing—specifically jeans and a plaid shirt. Inmate Regina Latham testified that the officer in civilian clothes was Deputy Ramey who sustained an injury to his finger during the fight. Although the resolution of this conflict in testimony is not essential to the outcome of this case, the court finds that at least one deputy, other than Hollis, had on civilian clothing at the time of the fight in Maximum 3. It is difficult to understand why this fact was so vehemently denied by the defendants, and reflects negatively on their overall credibility as to the more critical issues in this case.

C. Scene Two: The Trustee Hall

After Smith was subdued and disarmed inside Maximum 3, the deputies dragged him into the trustee hall which runs directly outside the four maximum security cells.

1162

He testified that he was kicked by Hollis and struck several times by the other deputies once they were in the trustee hall. White testified that he could observe the events in trustee hall through a small window in Maximum 4. An experiment conducted by the defendants indicates that the view of trustee hall from Maximum 4 is somewhat limited, and that White's view of the events which transpired there was limited, at best. White testified that he saw Hollis twice kick Smith as Smith lay handcuffed on the floor. At this point, Smith had ceased active resistance to the deputies, and was giving them what Deputy Sherrill described as "passive resistance." Smith testified that he was not offering any resistance, and that he was unconscious or semi-conscious after being dragged from his cell. Hollis testified that although Smith offered "physical resistance" inside Maximum 3, there was no such *active* resistance outside the cell.

To a man, the defendants deny that any deputy struck Smith at all on the morning of January 19, 1982 outside Maximum 3. They deny that any deputy even removed his night stick from its ring holder, much less struck the plaintiff with it. Defendants deny that Smith was either punched or kicked by any of them. In essence, defendants would have the court believe that Smith was subdued and disarmed, and received numerous bruises and abrasions in a wrestling match in which no blows whatsoever were struck by the deputies. The court finds this absolute denial of any blows being given to Smith not to be worthy of belief. Any reasonable person would expect deputies attempting to disarm an actively hostile inmate to have to forcibly deal with that inmate in order to protect themselves. The unqualified denial that any blows were struck again calls into question the overall credibility of the defendants' testimony at trial. This is particularly true, given the self-serving nature of these denials.

It became obvious in the trustee hall that both Smith and Deputy Ramey had been injured in the altercation inside Maximum 3. Ramey had sustained a cut between two fingers on his right hand. Smith had sustained a laceration on his head which was bleeding noticeably. Smith had blood on his forehead, his hair and on his upper body. When he was dragged from his cell, he was dressed in a t-shirt and a pair of cut off jeans. His shoes and socks were removed during, or immediately after, the altercation.

D. Scene Three: The Main Hall

The trustee hall in the Bossier Jail is connected to the main hall by a doorway. Smith was moved through this door into the main hall, where the deputies subjected Smith to what must be characterized as unjustifed abuse.

Inmate Regina Latham was housed in the juvenile detention cell on January 19, 1982. The juvenile cell was being used as a women's detention area. Latham was awakened by a cell mate who told her that there was an altercation involving the deputies and Smith. It was impossible to see Maximum 3 from Latham's cell because of the wall between the trustee hall and the main hall; however, Latham had a relatively clear view of the main hall from her cell. She testified that the six deputies brought Smith into the main hall and forced him to the ground. She testified that Smith was laying on the floor, face down, with his hands cuffed behind his back. She stated that she saw blood on Smith's head. Latham testified that five of the deputies were standing around Smith as he lay on the floor. She testified that Deputy Pilkinton hit Smith several times with his night stick. The blows were directed at Smith's back and shoulders. Latham also testified that Deputy Godwin kicked Smith while he was on the floor.

Smith stated that he was only semi-conscious as he lay in the main hall, an assertion corroborated by Latham's observations. Deputy Godwin stated, incredibly, that Smith's appearance was "good," and that he was not unconscious. In fact, each of the defendants testified that Smith did not appear to be injured at all, despite subsequent contradictory indications docu-

mented later that day by medical personnel at Hunt Correctional Institute. Deputy Hollis did admit that Smith looked like someone who had been involved in an altercation, but that he appeared "okay" to Hollis. Again, the testimony of the deputies that Smith had no outward signs of physical distress flies in the face of common sense, and gives cause to again question the defendants' credibility.

### E. Scene Four: The Booking Desk

Smith was carried and/or dragged by the arms down the main hall to the area in front of the jail booking desk. At least three officers were involved in "escorting" Smith to this location for the purpose of installing transportation chains. The testimony was uniform that Smith was not walking on his own down the main hall. It was described as his being assisted to walk (as one too drunk to stand alone). Defendants assert that Smith was giving them passive resistance, whereas Smith contends that he was semiconscious and unable to walk. Inmate Kenny Ouzts was sitting in a chair located in the main hall directly in front of the booking desk. Ouzts was to be transported, along with Smith and two other inmates, to state prison facilities in south Louisiana. Ouzts had been removed from his cell and initially placed in Drunk Tank 1, also directly across the hall from the booking desk. He testified that he had eaten his breakfast in the drunk tank, but had been removed from the cell and had his travel chains installed. Defendants testified uniformly that Ouzts was not in the hall, but was still in the drunk tank when the events at the booking desk came to pass. It was admitted by the defendants that an inmate inside Drunk Tank 1 had a clear view of the area in front of the booking desk. A factual finding is made that Ouzts had been removed from the drunk tank and prepared for transport with the other inmates, including Smith. The court notes that the dispute and altercation between the deputies and Smith caused a delay in the departure in the jail van for South Louisiana. It is only logical that the other inmates to be transported with Smith would already have been prepared for travel with the installation of the travel chains. Thus, the court finds the defendants' testimony that Ouzts had not been so prepared and was still in the drunk tank to be not credible.

Ouzts testified that the three deputies, with Smith in tow, rounded the corner in the main hall at a fast pace. When they got to the booking desk, Smith was forced to the floor where the deputies began installing travel chains. As he lay on the floor, Smith moved one of his legs whereupon Deputy Carter stomped Smith's knee, forcing Smith to lay still. Ouzts testified that Smith was not fighting the officers or attempting to attack them. Capt. Hollis admitted that there was no physical resistance at the booking desk, only "pulling back" by Smith. Deputy Sherrill described Smith's behavior on the floor in front of the booking desk as "passive resistance." Despite the fact that Smith obviously had been subdued and was completely under control as he lay on the floor, handcuffed, Ouzts said that one of the deputies struck him on the head with a black jack. Ouzts further testified that he was only three or four feet from Smith at the time the blow was delivered. He described the black jack as a "black, leather-encased piece of lead." Again, the court notes that the defendants uniformly deny that any blows of any kind were delivered by them to the plaintiff. They also deny that any instrumentality, including a black jack, was used in subduing the plaintiff. Capt. Hollis stated that he had never seen a black jack in Bossier Jail. The totality of facts and evidence adduced at trial render these self-serving denials unbelievable.

### F. Scene Five: The Jail Loading Area:

After Smith's travel chains were installed, and his hands cuffed in front of his body, he was taken to the jail elevator down the hall from the booking desk. There is confusion in the testimony as to whether Smith was taken down in the elevator alone or with the other inmates to be transported to South Louisiana. Ouzts testified that the four inmates, chained and

handcuffed, went to the jail loading dock together with three deputies. The defendants contend that Smith was taken down in the elevator alone by the three deputies so that he could be "secured" on the loading dock. However, it was never explained how he was "secured," or who brought the other three prisoners down in the elevator. Suffice it to say that eventually the four inmates, and Deputies Hollis, Carter and Godwin, found themselves on the jail loading dock. Deputies Ramey and Pilkinton were taken to a nearby hospital for emergency treatment of the injuries they suffered in the altercation with Smith. Smith received no first aid, nor was he transported to any hospital for medical care of any kind.

Smith and the other three inmates were to be transported to South Louisiana by Carter and Godwin in a "Suburban" van. The vehicle had four doors and a station wagon-type rear door. Inside, the van had two seats in the front—one for the driver and one for another passenger. In the rear of the van are two bench-type seats, where inmates are seated for transportation. Smith was placed in the rearmost seat, and his hands were chained to the arm rests. Ouzts and the other two inmates were seated in the foremost bench seat. Ouzts was ordered to look forward and not to say anything.

Capt. Hollis testified that, while on the loading dock, he observed Smith's physical condition. Hollis stated that Smith did not appear to be unconscious, and that the inmate was moving. However, he admitted that Smith said nothing to him. On cross-examination, Hollis testified that he asked Smith how he felt, but that Smith did not respond. In his pretrial deposition, Hollis stated that he had not asked Smith about his physical condition—a contradiction of his trial testimony. Hollis added that Smith "was in pain, just like the deputies," but that he was not sent to the hospital like the deputies. Deputy Godwin observed Smith in the van and stated that he was "roughed up a little bit." Godwin observed that Smith had blood around his face and on the rest of his upper body. Godwin

admitted that he did not examine Smith and did not know whether Hollis examined the plaintiff for injuries. Godwin stated that he assumed that Hollis examined the plaintiff, and that Hollis looked at the plaintiff while on the loading dock.

Both Godwin and Hollis testified that they had received first aid training earlier in their careers. Each of them testified that, in the event of a head wound, the bleeding should be stopped, the wound cleaned and a dressing applied. All of the defendants admitted that Smith was neither given first aid nor was he cleaned up before being transported to Hunt Correctional Institute.

G. Epilogue

Deputy Godwin testified that the difficulties encountered with Smith at the jail put him behind schedule. Godwin stated that Department of Corrections facilities will not accept prisoners after a certain time of day, and that he was in a hurry to begin the trip south. When the van arrived at Hunt Correctional Institute, Godwin escorted Smith to the booking area, and did not take him to the prison hospital or request medical care for the plaintiff.

James Anding is currently a licensed practical nurse at Washington Correctional Institute. In January 1982, he was on duty in the prison hospital at Hunt Correctional Institute. Anding testified that his job was to interview inmates concerning medical problems when they were processed into Hunt. On January 19, 1982, Anding was interviewing another inmate when he was interrupted by security guards. Anding stated that such interruptions were out of the ordinary, and allowed only in extreme situations. Anding was requested by the guard to take a look at Smith. Anding observed that Smith had dried blood in his hair and on his face, and that his cheek and the right side of his face were swollen. According to Anding, the plaintiff "looked like he'd been put through a meat grinder." A photograph taken of Smith two days after his arrival at Hunt shows multiple

bruises, abrasions and extensive swelling of Smith's face.

After observing Smith, Anding called a physician, the hospital administrator and the warden. Again, this procedure was extraordinary, and reserved only for situations when an inmate arrived at Hunt with an injury or wounds.

Anding reviewed the medical records made by the personnel at the Hunt hospital. Smith was complaining of pain in his ribs, chest and head, and he had a 2-centimeter laceration on his scalp which required two stitches. There were multiple bruises and contusions noted, particularly elongated, rectangular-shaped bruises on his back and shoulders. Smith was given a tetanus shot as a result of the laceration on his head. The medical examination performed by Hunt personnel found no broken bones, no skull fracture, no concussion or torn ligaments. Several days after his arrival at Hunt, Smith was given Tylenol for pain, and was eventually given a prescription for this drug, to be taken twice a day for five days.

Dr. George McCormick is the coroner for Caddo Parish, Louisiana. He has been awarded degrees as a doctor of philosophy and a medical doctor, specializing in forensic pathology. Dr. McCormick has extensive experience in reviewing medical records for the purpose of determining the causes of particular traumatic injuries. He was offered and accepted as an expert witness in the area of forensic pathology.

Dr. McCormick testified that he had made a review of the medical records prepared on Smith by the Hunt Correctional Institute personnel. Dr. McCormick made an item-by-item review of Smith's injuries noted on these medical records. He noted that Smith had numerous "linear bruises" on his ribs, along his spine and on his shoulders. He stated that in his opinion, Smith had received "multiple blows with an elongated instrument, solid to semi-solid." The doctor also stated that Smith possibly could have been struck by fists. His medical opinion was based on the very detailed descriptions of the injuries noted in Smith's medical records at Hunt.

On cross-examination, Dr. McCormick testified that it was *possible* that Smith's injuries could have been caused by multiple falls, but not the single fall to the cell floor uniformly testified to by the witnesses. Conversely, the doctor felt that Smith's injuries "most probably" were caused by multiple blows.

Dr. McCormick testified that a cut on a person's head bleeds more profusely than other similar cuts. He stated that a 2-centimeter laceration, like that suffered by Smith, bleeds profusely and immediately. The risks associated with the nontreatment of head wounds include the loss of blood, infection and possible skull fracture and concussion.

Similarly, there are unseen dangers associated with blows or kicks to a person's ribs. The principal risks are possible internal organ damage and the chance of broken ribs puncturing the chest cavity. Dr. McCormick stated that the symptoms of bruised ribs and broken ribs are essentially the same.

Dr. McCormick was of the opinion that, in light of the injuries annotated on Smith's medical records, Smith should have been given immediate diagnostic care to determine the seriousness of his head laceration and the bruised ribs.

James E. Ritchel is the current superintendent of the Caddo Detention Center for Caddo Parish, Louisiana. Ritchel has an extensive background in prison administration, particularly in military prisons. He was offered and accepted as an expert in the area of corrections management. Ritchel testified that he was familiar with the generally accepted corrections standards existing in 1982. Ritchel was given a hypothetical question based on facts similar or identical to those present in this case. Ritchel was asked for his opinion of the proper course of action, given such facts, in light of the accepted corrections standards existing in 1982. Ritchel stated that an inmate suffering injuries similar to Smith's should be given first aid for the head wound, and

a determination made as to the seriousness of the injury. He felt that a conservative course of action would call for taking the injured inmate to the LSU Medical Center for evaluation prior to transporting the inmate to South Louisiana. Ritchel admitted that, at Caddo Detention Center, inmates are "frequently" transported just to be safe. On cross-examination, Ritchel stated that if he did not know of a head laceration similar to Smith's he would probably go ahead and transport the inmate. The court finds such a hypothetical irrelevant, because the record makes it clear that there was a significant amount of blood on Smith's head, face and upper body—an amount sufficient to put a reasonable person on notice of a potentially serious injury.

Deputy Lamar Breedlove conducted an "internal affairs" investigation into the events involving Smith and the defendants on the morning of January 19, 1982. He testified that the purpose of his investigation was to "get the details," and not to secure a criminal indictment. Breedlove interviewed Ramey and Pilkinton several hours after the altercation in Maximum 3. Hollis gave Breedlove the torn shirts worn by Carter and Pilkinton, and the money clip used by Smith to attack the deputies. Breedlove interviewed inmates Tomley and Gaskin, but was told they saw nothing because Hollis had them locked in another cell before the incident. That was the extent of Breedlove's "internal affairs" investigation. Breedlove made no attempt to interview either Smith or any potential inmate witness. Clearly, he accepted his fellow deputies' version of the events and made the following conclusions: first, the deputies involved in the altercation used necessary force in transporting Smith to the Department of Corrections facility; second, Smith was armed with a money clip/knife; and, finally, that Smith injured three of the deputies.

As this court commented during the trial, Breedlove's investigation was cursory at best. He made no effort to interview anyone other than his fellow officers and made no blood tests on the deputies torn shirts to determine whether any blood found there came from Smith or one of the deputies. Based on Breedlove's inadequate investigation, this court has difficulty comprehending how he could have reached a reasonable conclusion that the deputies used necessary force in dealing with Smith.

## III. CONCLUSIONS OF LAW:

### A. General

▮ Federal question jurisdiction in this case is properly founded on 28 U.S.C. §§ 1331 and 1343. Pendent jurisdiction is appropriate for the state law claims raised by Smith since those claims arise from a "common nucleus of operative facts." *United Mineworkers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). There is no issue here as to joinder of issues, or the propriety of parties.

▮ Deputy Rick Ramey was named as a defendant in Smith's original and amended complaints. The court takes judicial notice of the death of Deputy Ramey. In civil rights actions brought under 42 U.S.C. § 1983, state law controls on the issue of the survival of the cause of action. *Shaw v. Garrison,* 545 F.2d 980 (5th Cir. 1977). Louisiana Code of Civil Procedure art. 428 specifically provides that actions do not abate on the death of a party. Therefore, any liability on the part of Deputy Ramey will be adjudged against his estate. The same rule of law applies to any liability on the part of Deputy Ramey under the pendent state law claims. *Id.; see also, Clark v. Universal Builders, Inc.,* 409 F.Supp. 1274, 1283 (N.D.Ill.1976); *Rogers v. Douglas Tobacco Board of Trade,* 244 F.2d 471 (5th Cir.1957); *Pritchard v. Smith,* 289 F.2d 153 (8th Cir.1961).

In the case of *Aulds v. Foster,* 484 F.2d 945 (5th Cir.1973), the court discussed a general policy against federal intervention in the discipline practices of a state jail:

As a matter of policy federal courts are reluctant to interfere with internal prison discipline, however, this chariness does not mean that prison officials have unfettered discretion in the treatment of their prisoners.... An unjustified bru-

tal beating by prison guards is sufficient to state a claim under 42 U.S.C. §§ 1981–83....

484 F.2d at 946.

## B. Liability of the Deputies

### 1. Federal Law Claims

In order to prevail in a civil rights action under 42 U.S.C. § 1983, the plaintiff must prove by a preponderance of evidence that the conduct of the defendants was under the color of state law, and that the conduct resulted in a deprivation of rights, privileges and immunities secured by the United States Constitution and/or its statutes. *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981); *Shillingford v. Holmes,* 634 F.2d 263 (5th Cir.1981). It is not contested in this case that the sheriff and his deputies were acting under the color of state law in the performance of their duties at the time of the altercation with the plaintiff on January 19, 1982. Thus, in order to establish liability under § 1983, Smith must prove by preponderance that he was deprived of his Fourth, Eighth and Fourteenth Amendment rights by the defendants. *McQurter v. City of Atlanta, Ga.,* 572 F.Supp. 1401, 1411 (N.D. Ga.1983).

■ There is no question that the physical abuse of an inmate, caused by the application of excessive force by the jailers, and the denial of medical care to that inmate are cognizable in § 1983 actions. *Shillingford, supra,* at 265; *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 295, 50 L.Ed.2d 251 (1976); *Williams v. Treen,* 671 F.2d 892, 901 (5th Cir.1982). However, as noted by Judge Rubin in the *Shillingford* case:

> Because 42 U.S.C. § 1983 is not a general tort statute but imposes liability only for rights secured by the Constitution and the laws of the United States, it does not grant a cause of action for every injury wrongfully inflicted by a state officer.

634 F.2d at 264. The determination of whether the actions by a police officer represent a constitutional deprivation depends on the totality of circumstances, and must be determined on a case-by-case basis. *Id.* at 265.

### (a) Physical Abuse and Excessive Force

■ The Eighth and Fourteenth Amendments to the Constitution guarantee a state inmate's right to be free from physical abuse, and cruel and unusual punishment. This protection subsumes physical abuse by the police under color of state law. In *Estelle v. Gamble, supra,* the Supreme Court set forth a broad, general standard for determining whether state activity was violative of the Eighth Amendment:

> Our most recent cases, however, have held that the Amendment proscribes more than physically barbarous punishments.... The Amendment embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency ..., against which we must evaluate penal measures. Thus, we have held repugnant to the Eighth Amendment punishments which are incompatible with the evolving standards of decency that mark the progress of a maturing society ..., or which involve the unnecessary and wanton infliction of pain.

429 U.S. at 102–03, 97 S.Ct. at 290.

In *Shillingford, supra,* the court stated that a law enforcement officer's infliction of personal injury on an individual by the application of unnecessary force may also deprive the victim of liberty without due process of law, a violation of the Fourth Amendment. 634 F.2d at 265.

■ In civil rights cases alleging the excessive use of force by prison officials, the district court is required to review the totality of facts and search for:

> Such factors as the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.

*Williams v. Kelley,* 624 F.2d 695 (5th Cir. 1980); *Hamilton v. Chaffin,* 506 F.2d 904

(5th Cir.1975), *citing, Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973).

In the *Shillingford* case, the court summarized the inquiry to be made in a § 1983 excessive force case:

> In determining whether the state officer has crossed the constitutional line that would make the physical abuse actionable under section 1983, we must inquire into the amount of force used in relationship to the need presented, the extent of the injury inflicted and the motives of the state officer.

634 F.2d at 265.

■ The application of force by jail officials to protect themselves, and to maintain and restore discipline is appropriate if the application of force is reasonable and made in good faith. *Williams v. Kelley, supra,* at 698. Additionally, prison officials may use reasonable force to move inmates and to ensure compliance with regulations. *Diamond v. Thompson,* 364 F.Supp. 659 (M.D.Ala.1973), *cited* favorably in *Williams v. Kelley, supra.* However, when the necessity for the application of force by the jail officials ceases, the continued use of harmful force can be a violation of the Eighth and Fourteenth Amendments. *McQurter, supra,* at 1414. In the case of *Dailey v. Byrnes,* 605 F.2d 858 (5th Cir. 1979), the court stated that a jail official's use of force in "retaliation" for a provocative act by an inmate is "more likely to be not an effort to restore order but instead either a motive for maliciously striking the plaintiff for the very purpose of causing harm or else summary, informal, unofficial and unsanctioned corporal punishment—an obvious due process violation." 605 F.2d at 861.

■ It is well established that § 1983 "should be read against the background of tort liability." *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); *Williams v. Kelley, supra,* at 697. Under Louisiana tort law, self-defense can be a justification for inflicting injury on another, but the force exerted in self-defense must be necessary and not excessive. Judge West discussed the Louisiana doctrine of self-defense in the case of *Baggett v. Richardson,* 342 F.Supp. 1024 (E.D.La. 1972):

> The rule is well-established in Louisiana jurisprudence that when one, though first acting in self-defense, resorts to excessive violence and unnecessary force in repelling an assault, he becomes liable as an aggressor and is subject to an action for damages for assault and battery.

342 F.Supp. at 1027. Thus, although jail officials may use necessary force to protect themselves and to enforce prison regulations, their license to apply such force terminates when the need therefor ceases to exist. Further application of harmful force by prison officials can constitute a deprivation of an inmate's rights.

■ When Smith refused to leave his cell to be transported to Hunt Correctional Institute, it was appropriate for the Bossier Parish deputies to apply reasonable force to cause Smith to comply with their orders. Reasonable force was also justified when Smith armed himself with the money clip/pen knife and physically resisted Deputies Carter and Pilkinton. However, after Smith had been disarmed, subdued and handcuffed, the deputies had no further justification to exert force on Smith—particularly when that force took the form of kicks to the body and blows with a night stick and/or a black jack. Once Smith was handcuffed, he no longer posed a threat to the physical safety of the deputies or to the maintenance of order in the jail. The physical abuse of Smith by the Bossier Parish sheriff's deputies after he was removed from Maximum 3 was "grossly disproportionate to the need for action under the circumstances," and it must be concluded that the abuse "was inspired by malice rather than merely carelessness or unwise excess of zeal." *Shillingford v. Holmes, supra,* at 265. The continued application of force was sufficiently serious to rise to a constitutional tort when considered in light of the "relationship between the need and the amount of force that was used" by the

defendants. *Williams v. Kelley, supra,* 697. When Smith terminated his violent and physical resistance to the officers inside Maximum 3, the defendants were transformed into the aggressors when they continued their attacks upon Smith in the main hall and in front of the booking desk. This continued application of force by the defendants constituted a violation of Smith's Fourth, Eighth and Fourteenth Amendment rights, and, under § 1983, he is entitled to compensation for his injuries.

■ The testimony establishes that only Hollis, Carter and Pilkinton actually delivered blows to Smith outside Maximum 3. However, the testimony also establishes that *none* of the deputies present made any effort to restrain or stop the continued abuse of Smith. In light of this finding, under the law of § 1983, all of the deputies present at the scene are liable for Smith's injuries. *Byrd v. Brishke,* 466 F.2d 6 (7th Cir.1972), *cited with approval in Harris v. Chanclor,* 537 F.2d 203, 206 (5th Cir.1976); *Davidson v. Dixon,* 386 F.Supp. 482 (D.Del.1974); *McQurter v. City of Atlanta, Ga., supra,* at 1415–16 and the cases cited therein.

### (b) Inadequate Medical Care

■ An inmate's right to reasonable medical care is also founded on the protections of the Fourth, Eighth and Fourteenth Amendments. Thus, a denial of such reasonable care is cognizable under § 1983. *Estelle v. Gamble, supra.* The United States Supreme Court has set forth the legal test for determining whether an inmate's rights to medical care have been violated as follows:

> We therefore conclude that deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain.... This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed.

*Id.* 97 S.Ct. at 291. The court summarized the burden placed on an inmate seeking recovery under § 1983:

> In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend evolving standards of decency in violation of the Eighth Amendment.

*Id.* 97 S.Ct. at 292.

The United States Court of Appeals for the Fifth Circuit interpreted the dictates of *Estelle v. Gamble* in *Ruiz v. Estelle,* 679 F.2d 1115 (5th Cir.1982). In *Ruiz,* the court observed:

> The state has an obligation to provide medical care for those whom it is punishing by incarceration. Acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs of inmates constitute cruel and unusual punishment.... The Constitution does not command that inmates be given the kind of medical attention that judges would wish to have for themselves, nor the therapy that Medicare or Medicaid provide for the aged or the needy. It prohibits only deliberate indifference to serious medical needs.

679 F.2d at 1149. Mere negligence by prison officials with respect to an inmate's medical needs, or medical malpractice, is insufficient to establish a compensable claim under § 1983. *Fielder v. Bosshard,* 590 F.2d 105, 107 (5th Cir.1979).

In *McQurter v. City of Atlanta, Ga., supra,* the district judge was faced with a situation where police officers applied a choke-hold to a detainee, resulting, ultimately, in the detainee's death. The officers asserted that the victim had no obvious wounds other than bruises and scratches, and that they were unaware of his grave medical condition. The court rejected these arguments and observed that, because of the nature of the choke-hold, the potential injuries associated with the choke-hold, and the detainee's unconsciousness, required the officers to take steps to provide medical care to the detainee. The

court determined that all of the officers involved had participated in basic first aid training, and continued:

> Prevailing standards of police work require that the officer on the scene render first aid to any injured subject and obtain emergency professionals to assist in more aggravated cases.

572 F.Supp. at 1418. Both the *McQurter* case and the *Dailey v. Byrnes* case, *supra,* stand for the proposition that police officials have a duty to secure medical attention for an injured detainee or inmate, even when the injuries result from the justified application of force by the officers. Simply put, the law requires that an inmate be given medical care even when he is injured in an altercation resulting from his own actions, such as Smith's refusal to leave his cell.

 As noted earlier, Smith did not suffer serious injuries at the hands of the defendants. He did, however, suffer a 2-centimeter laceration on his head requiring two stitches. He also received several blows on his back, shoulder and sides, resulting in very painful bruises and contusions. Capt. Hollis and the other defendants knew or should have known that Smith had a potentially serious cut on his head. Because they delivered the blows, the defendants also knew that Smith had been struck on the back and in the ribs, which posed a risk of internal injuries. As noted by Dr. McCormick, medical care includes not only actual medical treatment, such as first aid or stitches, but also diagnostic treatment. The obvious injuries suffered by Smith on the morning of January 19, 1982, were the type which required diagnostic treatment to determine whether Smith had suffered severe injuries. The fact that hindsight has proven that Smith's injuries were not severe cannot support a conclusion that the injuries were not "serious," as contemplated in *Estelle v. Gamble* or *Ruiz v. Estelle.*

It must be concluded that the failure of Capt. Hollis or the other defendants either to give Smith first aid for his head injury or to secure diagnostic evaluation was more than "mere negligence." All of deputies testified that they had received basic first aid training, and the failure to render even the most rudimentary aid to Smith amounted to a callous indifference to his potentially serious medical condition. Smith's resistance to the officers had caused a delay in the departure of the van for Hunt Correctional Institute. Deputy Godwin admitted that he was late leaving the parish jail for South Louisiana, and that there were potential problems in delivering the inmates to the Department of Corrections after a certain time. Clearly, the defendants ignored Smith's serious medical needs, and chose to send him on to Hunt in spite of the risk of harm. The court finds that Capt. Hollis was directly responsible for denying Smith any type of medical treatment for his injuries. Hollis was the supervisor of the jail and was directly responsible for the decision to forego medical care and transport Smith directly to Hunt. This decision was a violation of Smith's constitutional rights to adequate medical care, and renders Hollis liable for damages under § 1983.

### 2. State Law Claims

 Because the defendants have been found liable for damages suffered by plaintiff under the provisions of § 1983, the court is not required to determine liability under the Louisiana tort claims set forth by Smith. The remedies provided by § 1983 and the interpretive jurisprudence are the same, or more extensive, as the remedies available under Louisiana tort law.

### C. Liability of Sheriff Dooley

 It is well established in the federal jurisprudence that supervisory officials may not be held liable under § 1983 under the doctrine of *respondeat superior. Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Baskin v. Parker,* 602 F.2d 1205 (5th Cir.1979). In order to recover against a supervisory official, the plaintiff must show either that the official was personally involved in the unlawful actions or that

there is some causal connection between an act of the official and the alleged violation. *Id.* In *Monell,* the Supreme court held that the maintenance of an unconstitutional policy, regulation or system officially adopted by the supervisory official constituted a sufficient causal link to establish liability of that official under § 1983. *Id.*

 In an oral ruling delivered immediately prior to trial, this court granted the plaintiff's motion *in limine* requesting the application of the doctrine of offensive collateral estoppel. Essentially, this court ruled that Sheriff Dooley was estopped from claiming that he maintained an adequate system of medical care for inmates incarcerated at the Bossier Parish Jail. This ruling was premised on a Judgment entered on January 3, 1983, in the case of *Williamson v. Dooley,* Civil Action No. 80–1652, United States District Court for the Western District of Louisiana. One of the principal faults found with the medical care system at the Bossier Parish Jail was the guards' complete and unbridled discretion over which inmates received medical care and when medical care was appropriate. This systemic inadequacy was obvious in the case at bar when Hollis exercised his absolute discretion and arbitrarily determined that Smith needed no medical care. Therefore, the denial of Smith's right to adequate medical care is causally linked to Sheriff Dooley's maintenance of an inadequate medical care system at the Bossier Parish Jail. Under the dictates of *Monell,* this is sufficient to find him jointly liable under § 1983 along with his deputies.

This court declines to find that Sheriff Dooley maintained a system and/or policy of physical abuse of prisoners at the Bossier Parish Jail. This allegation was not proved by a preponderance of credible evidence. However, the physical abuse of Smith and the denial of adequate medical care were joint producing causes of Smith's injuries; therefore, the sheriff is jointly liable with his deputies for those injuries under § 1983.

The sheriff's liability under the doctrine of *respondeat superior* provided for in Louisiana tort law need not be discussed because of his liability under § 1983.

D. Qualified Immunity

 The defendants made reference to the doctrine of qualified immunity available to police officials in their pretrial memorandum. However, the qualified immunity defense was never affirmatively pleaded in the record. The defenses asserted by the defendants were that this court lacked jurisdiction and that the actions taken by the deputies were reasonable in light of the circumstances. According to the United States Supreme Court in *Gomez v. Toledo,* 446 U.S. 635, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980), a defendant official has the burden of affirmatively pleading the qualified immunity defense. The plaintiff does not have the burden of anticipating the defense, and countering it. *Id.* 100 S.Ct. at 1924. The Supreme Court held that if the qualified immunity defense was not affirmatively pleaded, the defendant could not take advantage of the defense.

IV. DAMAGES:

 The principal purpose of a damage award under § 1983 is to compensate persons injured by the deprivation of constitutional rights. *Carey v. Piphus,* 435 U.S. 247, 254, 98 S.Ct. 1042, 1047, 55 L.Ed.2d 252 (1978). In addition to recovery for the deprivation of the constitutional right itself, the plaintiff may also recover for injuries that are the natural consequence of the deprivation. *Whirl v. Kern,* 407 F.2d 781, 797 (5th Cir.1969); *see also, Baskin v. Parker,* 588 F.2d 965 (5th Cir.1979). As a general rule, nominal damages are presumed to exist where a constitutional violation has occurred. *Wilson v. Taylor,* 658 F.2d 1021 (5th Cir.1981).

 The evidence adduced at trial makes it clear that Smith was deprived of his constitutional rights under the Fourth, Eighth and Fourteenth Amendments. Additionally Smith suffered pain and suffering as a result of the deputies' physical abuse and delay in medical treatment. Although Smith's injuries were not severe, he

is entitled to some reasonable compensation from the defendants. In light of all the evidence now existing in the record, this court finds that an appropriate award to Smith for the constitutional deprivations noted above, and his pain, suffering and emotional distress, is the sum of $2,500. The court expressly finds that this is not an appropriate case for punitive damages, under the controlling Fifth Circuit jurisprudence. The court also expressly finds that the sum awarded is appropriate because Mr. Smith brought most of his injury on himself. His adamant refusal to obey a lawful order, and his use of a weapon in the resulting melee makes a greater award inappropriate. The court also finds that injunctive relief, as requested in the complaint, would be inappropriate.

## V. CONCLUSION:

In the quiet chambers of judicial decision-making, where lies are made of brick and truth composed only of feathers, this case involved the weighing of very few feathers in the search for a preponderance of truthful evidence, and involved discovery of enough bricks to build the Great Wall of China. However, this court has made its credibility choices, as required by law, and upon those choices has based this opinion.

It must be noted that the purpose of this ruling is not to tie the hands of our law enforcement personnel in their dealings with obdurate or obstreperous jail inmates. Jail and prison officials must, and do, have the authority to use *reasonable* force in maintaining order in the jails, and in protecting their own personal safety and the personal safety of other inmates. However, with the license to use reasonable force comes a heavy responsibility to apply that force *only* when justified, and to terminate the use of force when the justification for it ceases. The continued unjustified application of force amounts to physical abuse of an inmate, abuse which is prohibited by the United States Constitution.

For the reasons set forth above, judgment is entered in favor of Jessie Lee Smith, and against Sheriff Vol S. Dooley, J.W. Hollis, Larry Sherrill, Cecil Godwin, Jerry Carter, Mert Pilkinton and the estate of Rick Ramey. Jessie Lee Smith is awarded damages against the above-named defendants in the amount of $2,500. The plaintiff will submit his request for attorney's fees within thirty (30) days of the entry of this ruling.