[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-12128
Non-Argument Calendar
_____

D.C. Docket No. 1:13-cv-02250-SCJ

JUSTIN SHUFORD,
RYAN ANISKO,
ANDRES DE JESUS,
DEVIN LUNDE,
on behalf of themselves and all other similarly situated,

Plaintiffs-Appellants,

versus

R.L. BUTCH CONWAY,
Sheriff of Gwinnett County, Georgia,
COLONEL DON PINKARD,
Administrator of the Gwinnett County Jail,
LT. COL. CARL SIMS,
Commander of the Rapid Response Team
at the Gwinnett County Jail,

Defendant -Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(November 18, 2016)

Before TJOFLAT, MARTIN, and JILL PRYOR, Circuit Judges.

PER CURIAM:

Justin Shuford, Ryan Anisko, Andres De Jesus, and Devin Lunde (collectively, "plaintiffs") brought a § 1983 action on behalf of themselves and others similarly situated against Gwinnett County Sheriff R.L. "Butch" Conway, Colonel Don Pinkard (Gwinnett County Jail Administrator), and Lieutenant Colonel Carl Sims (Commander of the Rapid Response Team at the Gwinnett County Jail) (collectively, "defendants").  Plaintiffs were pretrial detainees at Gwinnett County Jail and sought damages and injunctive relief for excessive force they allege they endured from the Gwinnett County Sheriff Department's Rapid Response Team ("RRT") in violation of the Fourteenth Amendment.  The district court granted summary judgment in favor of the defendants, finding that they were entitled to qualified immunity and were not subject to supervisory liability.  Our careful review persuades us we must reverse the district court's grant of qualified immunity to defendants as well as its finding that Sheriff Conway and Lt. Col.

2

Sims were not subject to supervisory liability.  We affirm the district court ruling that Col. Pinkard was not subject to supervisory liability.

I.

The RRT is a specialized unit of the Gwinnett County Sheriff's Department that resolves high-risk incidents and provides general assistance in maintaining order at the Gwinnett County Jail ("Jail").  Its duties include providing support in the pre-admissions and admissions areas of the Jail where all inmates enter the facility.  In these areas, deputies rely on their training and experience to identify and respond to inmate behavior that could harm Jail staff or the inmates themselves.  Incoming inmates who display harmful behavior are placed into isolation cells to deescalate the situation.  If a deputy determines that isolation is ineffective in deescalating the situation, then the deputy can contact his or her supervisor for approval to deploy the RRT.  Once the RRT assembles outside of the isolation cell, the team decides whether entry into the cell is still necessary.  After the RRT is assembled, the Jail staff will often video the entry.

The RRT uses a variety of techniques and devices.  In entering the isolation cell, the RRT uses a SWAT-team-style "dynamic entry," which involves a combination of force and one or more "distraction devices" to subdue an inmate.

3

Three of the most commonly used devices are the Pepperball gun, which shoots a high-pressure plastic ball releasing pepper spray or talcum powder; the Hotshot, which shoots a cloud of powder or pepper spray into the inmate's face; and the Taser, an electroshock weapon.  After the inmate is subdued, he or she is placed in a "restraint chair"—a chair equipped with belts, cuffs, and straps that prevent the inmate from moving.  Inmates are often kept in a restraint chair for up to four hours.  After an inmate is restrained, the RRT immediately brings in medical personnel to check the inmate's vitals and continually monitor the inmate's medical status while restrained.

All four named plaintiffs were pretrial detainees held in the pre-admissions or admissions area of the Jail after being arrested for nonviolent offenses.  Shuford was placed in an isolated holding cell on April 11, 2013 after he was told to move away from a window and failed to do so.  He was not allowed to take his meal with him to the isolation cell and expressed frustration about this.  Shuford began banging on the metal partition of his cell, and the RRT determined that this created a risk he would harm himself.  However, the video of the incident shows Shuford stood calmly, quietly, and alone in his isolation cell before the RRT rushed in without warning.  The RRT shot him twice with a Pepperball gun, slammed him to the floor, applied pressure point control techniques, and then threw him into a restraint chair.  The video shows that throughout the encounter, Shuford was

4

screaming in pain, apologizing, and saying that he is calm and not resisting. It also shows the RRT was telling him to stop resisting, despite no visible resistance. The RRT kept Shuford in the restraint chair for three hours and forty minutes.

De Jesus was placed in an isolation holding cell on June 15, 2013 after acting aggressively toward another inmate. He knocked on the doors and walls of his isolation cell to get the deputy's attention, and refused to stop when instructed to. The RRT determined that this created a risk De Jesus might harm himself. The video of the incident shows De Jesus calmly standing in the isolation cell. When he was instructed by the deputy to turn around and kneel in the back of his cell with his hands on his head, he fully complied. The RRT then rushed in without warning and pinned him to the ground, handcuffing him before putting him in a restraint chair. The RRT kept De Jesus in the restraint chair for four hours and seven minutes.

Anisko was placed in an isolation holding cell on February 18, 2013 after becoming "uncooperative" during his initial processing. He was hitting the door of his cell with his head and hands, and the RRT determined that Anisko was using enough force to create a risk that he might hurt himself. The video of the incident shows that Anisko was upset, repeatedly asking for a pen to complete some paperwork and threatening to sue the Jail staff. The deputy asked him to go to the center of his cell and lie down with his hands behind his back. Anisko fully and

immediately complied.  Without warning, the RRT rushed in and jumped on top of him, applied pressure point control techniques, and then threw him into a restraint chair.  In the video, Anisko was audibly sobbing in pain and apologizing during this encounter.  The RRT kept Anisko in the restraint chair for three hours and thirty minutes.

Lunde was placed in an isolation holding cell on June 15, 2013 immediately after being patted down.  According to a deputy, he demanded to be transferred to a mental health facility in Atlanta and struck his cell window hard enough to make it bow.  The RRT determined this created a risk he would harm himself.  The video of the incident shows Lunde made several outbursts indicating that he felt he was being ignored by the deputies, including a rhetorical comment asking "what do I have to break my fucking hand off" in order to be transferred to the mental health facility.  The video also shows Lunde was told to sit down in his isolation cell and that he complied with this instruction before getting up and pacing in his cell.  The RRT then rushed in without warning.  They shot him several times with a Pepperball gun, stunned him with a Taser, and then slammed his head into the concrete, which rendered him unconscious.  Lunde screamed in agony during the entire encounter before the RRT knocked him unconscious.  The RRT told him to stop resisting, although no resistance is visible in the video.  Still unconscious, Lunde was then thrown into a restraint chair.  The RRT kept Lunde in the restraint

chair for four hours and six minutes before putting him in a restraint bed for roughly another eight hours.  During each of these four encounters, the plaintiffs were medically cleared after being restrained and continually monitored by medical personnel throughout the time of restraint.

The plaintiffs sued three defendants.  Sheriff R.L. "Butch" Conway is the Sheriff of Gwinnett County.  He oversees the Jail staff including the RRT.  Colonel Don Pinkard is the Jail Administrator.  He oversees and manages the Jail's operations including the RRT.  Lieutenant Colonel Carl Sims was the Commander of the RRT from 2000 to March 2013, and reported directly to Col. Pinkard.

The Commander of the RRT and the Jail Administrator have direct day-to-day oversight and control over the RRT.  After each RRT entry, a use of force file consisting of a written report and video is reviewed by the Commander of the RRT—in this case, Lt. Col. Sims.  Col. Pinkard does not generally review these reports and he does not select or train RRT members, but leaves that to the RRT Commander.  As Commander, Lt. Col. Sims reviewed every report and watched many of these videos.  Indeed, over the last five years, he reviewed hundreds of videos and recommended several cases to the Professional Standards Unit of the Sheriff's Department for further investigation.  Sheriff Conway watched some of these videos as well.  In his deposition, Sheriff Conway testified that he had viewed many RRT videos, including at least fifty that involved the use of a

7

restraint chair.  Sheriff Conway selects the Commander of the RRT.  After Lt. Col. Sims stepped down, he appointed Lt. Keith Cofer to the position.  Lt. Cofer was "very vocal" to Sheriff Conway in expressing his criticism of the RRT's tactics and use of force, which is in part why Sheriff Conway selected him for the position. Lt. Cofer told Sheriff Conway that he believed the RRT was sometimes using unnecessary force.

## II.

The district court granted summary judgment in favor of defendants, dismissing the named plaintiffs' claims before reaching the class certification stage.  We review de novo the district court's grant of summary judgment, considering the evidence and all reasonable inferences from it in the light most favorable to the nonmoving party.  Rioux v. City of Atlanta, 520 F.3d 1269, 1274 (11th Cir. 2008).  Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S. Ct. 2548, 2552–53 (1986).

## A.

The district court found that the defendants were entitled to qualified immunity.  We conduct a two-step inquiry to decide whether qualified immunity should be granted: (1) "taken in the light most favorable to the party asserting the

injury, do the facts alleged show the officer's conduct violated a constitutional right;" and (2) "[i]f a constitutional right would have been violated under the plaintiff's version of the facts, [we] must then determine whether the right was clearly established." Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002) (quotation omitted) (alteration adopted).  Because it is undisputed that the defendants were acting within the scope of their discretionary authority, the burden is on the plaintiffs to show that qualified immunity is not appropriate.  Id. at 1194.

i.

We begin with whether the facts alleged show a violation of a constitutional right.  The plaintiffs allege that as pretrial detainees they were subjected to "excessive force and prolonged punitive restraint" by the RRT at Gwinnett County Jail in violation of the Fourteenth Amendment.  The Supreme Court instructs that in deciding whether force deliberately used against a pretrial detainee is constitutionally excessive in violation of the Fourteenth Amendment, "the pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable."  Kingsley v. Hendrickson, 135 S. Ct. 2466, 2473 (2015).  A showing of the officer's state of mind or subjective awareness that the force was unreasonable is not required in this analysis.  See id. at 2472–73.  The objective-reasonableness determination must be made "from the perspective of a reasonable officer on the scene."  Id. at 2473.

9

The district court found that each named plaintiff failed to show a constitutional violation. Our review of the record leads us to contrary conclusions. In evaluating the use of force for objective reasonableness, the Supreme Court has told us to consider "the facts and circumstances of [the] particular case." Id. (quotation omitted). In doing so, we examine "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." Id.

This analysis turns largely on the facts, and when considering a qualified immunity defense at summary judgment, the evidence must be viewed in the light most favorable to the plaintiffs. Accepting the plaintiffs' version of the facts, we conclude that the RRT's use of force was objectively unreasonable in the four incidents described above. In each case, plaintiffs were in isolation holding cells so the only possible threat they posed was to themselves. All four plaintiffs were arrested for nonviolent offenses. And in at least two of the incidents, before the RRT used force, the plaintiffs were obeying commands to kneel or lie down in their cells with their hands on their heads. Also in each case, the RRT entered without warning and used techniques that resulted in audible responses of pain from the plaintiffs. One of the plaintiffs was knocked unconscious. The RRT shot

10

two of the plaintiffs with a number of Pepperball rounds, and stunned one of them with a Taser as well.  In all four cases, at the time the RRT entered, the plaintiffs appeared to be sitting or standing in their cells such that they could be restrained without the use of <u>any</u> force.  Based on these facts, and as shown in the videos of these incidents, the plaintiffs have established that the force used in these incidents was not objectively reasonable.  The factors that the Supreme Court has given as guidance—the relationship between the level of force used and the need for that force at the time it was used; the effort made to temper such force (or lack thereof); the severity of the security problem; the threat perceived; and the plaintiffs' active resistance (or again, the lack thereof)—are sufficient to establish violations of the plaintiffs' Fourteenth Amendment rights at the summary judgment stage.  As a result, we reverse the district court's finding that the plaintiffs' evidence failed to show a constitutional violation.

ii.

Next, we determine whether the constitutional right was "clearly established" under "the <u>plaintiff's</u> version of the facts." <u>Lee</u>, 284 F.3d at 1194 (emphasis in original).  "In this circuit, the law can be 'clearly established' for qualified immunity purposes only by decisions of the U.S. Supreme Court, Eleventh Circuit Court of Appeals, or the highest court of the state where the case arose." <u>Jenkins by Hall v. Talladega City Bd. of Educ.</u>, 115 F.3d 821, 826 n.4

11

(11th Cir. 1997). This inquiry is limited to the law at the time of the incident, as "an official could not be reasonably expected to anticipate subsequent legal developments." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982). Kingsley's 2015 ruling requiring a pretrial detainee to show that the force purposely or knowingly used against him was objectively unreasonable, came after the incidents that are the subject of this suit, so it does not govern our "clearly-established" analysis here. However, since before the time of these incidents, this Circuit applied the same objective factors to Fourteenth Amendment excessive force claims as the Supreme Court articulated in Kingsley.[1] See Cockrell v. Sparks, 510 F.3d 1307, 1311 (11th Cir. 2007) (per curiam). And in any event, the Supreme Court reminded us that the central holding of Kingsley— that "a pretrial detainee can prevail by providing only objective evidence"— had been the law since Bell v. Wolfish, 441 U.S. 520, 99 S. Ct. 1861 (1979). Kingsley, 135 S. Ct. at 2473–74.

A plaintiff can show the constitutional right violated was clearly established in three different ways: (1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the

---

[1] We agree with what the Seventh Circuit noted on remand in Kingsley—that the Supreme Court's holding only eliminated the requirement that a plaintiff show the official acted with subjective malice, not "the standard[] for the amount of force that can be permissibly employed." Kingsley v. Hendrickson, 801 F.3d 828, 832–33 (7th Cir. 2015). "[B]efore and after the Supreme Court's decision in this case, the standards for the amount of force that can be permissibly employed remain the same . . . . the law clearly established that the amount of force had to be reasonable . . . ." Id. (emphasis in orginal).

12

Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law. Lewis v. City of W. Palm Beach, 561 F.3d 1288, 1291–92 (11th Cir. 2009); see also Hope v. Pelzer, 536 U.S. 730, 743, 122 S. Ct. 2508, 2517 (2002) (noting that the reasoning of this Circuit's holdings, even if a case did not involve the same precise facts, sends a sufficient message to reasonable officers in this Circuit for the purposes of the "clearly established analysis").

These plaintiffs have made their showing by way of the second category. We have long made clear that "[p]rison officials step over the line of constitutionally permissible conduct if they use more force than is reasonably necessary in an existing situation." Ort v. White, 813 F.2d 318, 325 (11th Cir. 1987). Ort also established that a constitutional violation "occurs in this context where prison officers continue to employ force or other coercive measures after the necessity for such coercive action has ceased." Id. at 327. More recently in 2008, we held that "[w]hen jailers continue to use substantial force against a prisoner who has clearly stopped resisting—whether because he has decided to become compliant, he has been subdued, or he is otherwise incapacitated—that use of force is excessive." Danley v. Allen, 540 F.3d 1298, 1309 (11th Cir. 2008). This Court recognized in Danley that "[o]nce a prisoner has stopped resisting there is no longer a need for force, so the use of force thereafter is disproportionate to the

13

need." Id. Danley held that the use of pepper spray in a small, isolated cell when a plaintiff was no longer resisting was excessive. See id.

Plaintiffs' version of the facts applied to the principles from our long-standing precedent demonstrate a violation of clearly established law sufficient to pass the summary judgment stage.[2] Again, the RRT entered the plaintiffs' cells at a time when they were not resisting or displaying any sort of threatening behavior. Despite the fact that the need for force had completely subsided, the RRT deployed substantial force against the plaintiffs. This violated plaintiffs' constitutional rights under the law clearly established by the Supreme Court and this Circuit at the time. The law therefore gave "fair warning" to defendants "that their conduct crossed the line of what is constitutionally permissible." See Hope, 536 U.S. at 743, 122 S. Ct. at 2517. We therefore reverse the district court's finding that the alleged violation was not "clearly established."

## B.

The district court also found that the defendants had no supervisory liability for the RRT at the Jail. To establish supervisory liability, a plaintiff must show a "causal connection between [defendants'] actions and the alleged constitutional

---

[2] The district court relied on several cases cited by the defendants in which various courts have approved the use of force and restraints in the face of demonstrated self-harm. But in those cases, the security risk and the threat of self-harm from the inmate were far greater than here. See, e.g., Campbell v. Sikes 169 F.3d 1353, 1376–77 (11th Cir. 1999) (approving the use of restraints where the plaintiff made suicidal threats, stood on her bed with a sheet around her neck, dismantled parts of her cell, attempted to obtain sharp objects, started fires, and banged her head repeatedly).

14

violation." Keith v. DeKalb Cty., 749 F.3d 1034, 1047–48 (11th Cir. 2014).[3] "The necessary causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so," or "when a supervisor's custom or policy results in deliberate indifference to constitutional rights." Id. at 1048 (quotation omitted) (alterations adopted).

The plaintiffs have established a material question of fact as to whether Sheriff Conway and Lt. Col. Sims were on notice of a history of widespread abuse, and also whether Sheriff Conway's custom or policy resulted in deliberate indifference to their constitutional rights. However, neither method of proving the necessary causal connection for supervisory liability can be established for Col. Pinkard in this case.

First, deprivations constituting "widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences." Keith, 749 F.3d at 1048 (quotation omitted). Plaintiffs provided eight video discs full of RRT incidents over the years. They submitted affidavits from seven other pretrial detainees who say they were subjected to excessive force by the RRT. Sheriff Conway testified in his

---

[3] Plaintiffs may also show "that the supervisor [] directly participated in the unconstitutional conduct." Keith, 749 F.3d at 1047. However, the district court found no basis for direct liability and the plaintiffs do not argue here that defendants were directly liable or should be held liable due to direct participation.

deposition that he viewed many RRT videos, including at least fifty that involved the use of a restraint chair. Sheriff Conway also acknowledged he received "very vocal . . . criticism" from Lt. Cofer about the RRT's actions before Lt. Cofer took charge of the RRT.

With regard to Lt. Col. Sims, he reviewed and signed off on every single written report of an RRT entry and use of force. He reviewed hundreds of RRT videos over the last five years, referring some for further investigation. He was also a direct overseer of the RRT, selected the RRT staff, and trained them. This raises a material issue of fact whether Lt. Col. Sims was on notice of continued occurrences that violated detainees' constitutional rights. The district court ruling that there is "no evidence in the record" putting Sheriff Conway or Lt. Col. Sims on notice is simply not borne out by our examination of the record.

There is also an issue of material fact about whether Sheriff Conway's policies resulted in deliberate indifference to plaintiffs' constitutional rights. "Deliberate indifference requires the following: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than gross negligence." Keith, 749 F.3d at 1047 (quotation omitted). Again, there is evidence that Sheriff Conway received criticisms of the RRT and watched many videos of RRT incidents. Lt. Cofer, the former head of the RRT, warned Sheriff Conway that he believed unnecessary force was being used. And Sheriff Conway

16

said that at least some others in the Sheriff's office had raised these concerns as well. There is therefore a material question of fact about whether Sheriff Conway was on notice of a risk of serious harm, disregarded it, and did so by conduct that is more than gross negligence.

On the other hand, the record establishes that Lt. Col. Sims referred many incidents of RRT force for further investigation by the Professional Standards Unit of the Sheriff's Department. Therefore, plaintiffs have failed to make a sufficient showing of grossly negligent conduct as to Lt. Col. Sims. We affirm the district court in its finding that Lt. Col. Sims did not have supervisory liability under this method of proving a causal connection.

There are material questions of fact about whether Sheriff Conway or Lt. Col. Sims were on notice about a history of widespread abuse and whether Sheriff Conway had subjective knowledge of a risk of serious harm, disregarded that risk, and did so by conduct constituting more than gross negligence. As a result, we reverse the district court's grant of summary judgment on these issues.

For Col. Pinkard, we affirm the district court finding that he has no supervisory liability under either method of proof. Col. Pinkard did have command and oversight responsibilities for the RRT, but there is no evidence he took any role in overseeing the RRT's use of force, had any notice of the alleged widespread abuse, or was grossly negligent in ignoring a risk of serious harm.

17

Instead, he largely delegated these duties to the RRT Commander.  We also affirm the district court finding that Lt. Col. Sims has no supervisory liability under the deliberate indifference standard, because there is no evidence that he had subjective knowledge of any serious risk that he disregarded by conduct that was more than grossly negligent.

## C.

We also reverse the district court's dismissal of plaintiffs' claims for injunctive relief because that ruling was based upon the grant of summary judgment to defendants that no longer stands.

## III.

We recognize the difficult responsibilities placed on Jail staff in both protecting themselves, the inmates, and the Jail facility.  However, at summary judgment, it is not our role nor that of the district court to decide which way tough facts point.  Instead, we determine whether genuine material questions of fact exist. Our careful review of the record shows us they do.

**REVERSED IN PART, AFFIRMED IN PART, AND REMANDED.**