[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-14769
Non-Argument Calendar
_____

D.C. Docket No. 2:16-cv-14476-RLR

STEVEN KRAUS,

Plaintiff - Appellant,

versus

MARTIN COUNTY SHERIFF'S OFFICE,
WILLIAM D. SNYDER,
Sheriff, Martin County Sheriff's Office,
MICHAEL GARGAN,
DAVID SANSONE,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(September 4, 2018)

Before MARTIN, JILL PRYOR, and NEWSOM, Circuit Judges.

PER CURIAM:

Following his arrest for a DUI, Steven Kraus brought this action alleging (1) excessive-force claims under 42 U.S.C. § 1983 against Martin County Deputy Michael Gargan, Sergeant David Sansone, and Sheriff William Snyder, (2) state-law battery claims against Sansone and Gargan, and (3) a claim for deliberate indifference to serious medical needs under § 1983 against Snyder.  The district court granted summary judgment in favor of each defendant as to all claims, concluding (1) that Sansone and Gargan were entitled to qualified immunity on the excessive-force claims and statutory immunity under Florida Statute 768.29(9)(a) on the state-law battery claims, and (2) that Snyder was entitled to summary judgment because, as a matter of law, Kraus had not demonstrated deliberate indifference.  After careful review, we affirm.[1]

**I**

Although according to Kraus, he had "been drinking and driving [his] whole life,"[2] it wasn't until 2012 that he was finally caught and arrested for DUI by Florida Highway Patrol Trooper R.E. Weber.  While in transport to the Martin

---

[1] We review *de novo* the district court's ruling on the motions for summary judgment, construing all facts and drawing all reasonable inferences in the light most favorable to Kraus.  *Perez v. Suszczynski*, 809 F.3d 1213, 1216 (11th Cir. 2016).

[2] *See* Dashcam Video at 28:10.

2

County Jail for processing, Kraus repeatedly asked Weber to shoot him, telling Weber just to say that he tried to run away.  Once at the jail, Weber reported these statements to Gargan and Sansone.

During the booking process, Gargan removed Kraus's handcuffs and asked him to put his hands on the counter in front of him.  Gargan then asked Kraus to remove various personal items, while Sergeant Sansone watched nearby.  Kraus admits that he threw his belt and necklace on the counter during the process— because, he says, he was angry that the officers had made derogatory comments about his sexuality.

The parties disagree about what happened next.   Kraus asserts that the officers instructed him to remove his shoes and that when he removed his hands from the counter to comply they yelled at him to put his hands back on the counter. He contends that he then turned calmly towards Gargan to respond to yet another comment about his sexuality, at which point Gargan "grabbed [him] by [his left] arm and the back of [his] neck, slammed [his] head down on the counter, placed … both his legs behind [Kraus's] legs, and held [him] there in a controlled position." According to Kraus, even though he was completely subdued by Gargan's maneuver, Sansone "took [his] right arm off the table, twisted it behind his back and … lifted it straight over [Kraus's] head in an unnatural manner before

3

slamming [his arm] back down towards the table." Kraus states that he "heard a snap immediately and knew that his arm had been broken …"

Unfortunately for Kraus, a video recording of the booking process supports the officers' contrary account. The footage shows Kraus take his hands from the booking counter and turn toward Gargan. After this initial act of non-compliance—which Kraus's account omits—Gargan put his hand on Kraus's back and turned him toward the counter. Kraus then placed his hands on the booking counter. The video then shows Kraus remove his shoes as instructed and thereafter place his hands back on the counter for a few seconds. But he then removed his hands again and turned to face Gargan, at which point the officers reacted. Gargan grabbed Kraus's left arm and maneuvered his upper body toward the booking counter, while Sansone secured Kraus's right arm behind his back in an "arm bar."

Shortly thereafter, Kraus was given a breathalyzer test that showed his blood alcohol level was .151-.156. He was then transported to Stuart Memorial Hospital where it was determined that a bone in his right arm had been broken. The hospital placed his arm in a sling.

Kraus was then returned to the jail and placed in a cell. He was put on suicide watch, and his sling was removed per Sheriff's Standard Operating

4

Procedure 6.04-3, which requires removal of all personal items of an arrestee on suicide watch. He was released from jail several hours later and transported to the Port St. Lucie Medical Center, where he was institutionalized pursuant to Florida's Baker Act. He ultimately had surgery to repair his broken arm.

On appeal, Kraus first challenges the district court's qualified immunity determination because, he contends, (1) the district court misstated three legal standards governing the qualified immunity analysis and (2) clearly established law put defendants on notice that their actions violated Kraus's constitutional rights. Kraus then argues that the district court erred in concluding that the officers were entitled to statutory immunity for the state-law battery claims. Finally, Kraus asserts that the district court improperly granted summary judgment in favor of Snyder as to the deliberate-indifference claim.

## II

Qualified immunity protects government officials unless they violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Whether a defendant is entitled to qualified immunity is a question of law decided by the court. *Courson v. McMillian*, 939 F.2d 1479, 1486–87 (11th Cir. 1991).

In order to receive qualified immunity, the officers first must show that they acted within the scope of their discretionary authority. *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002). Because that is not disputed here, the burden shifts to Kraus to show that qualified immunity is inappropriate. *Id.* In order to meet his burden, Kraus must show (1) that the officers violated his constitutional rights and (2) that the illegality of their conduct was "clearly established" when the incident occurred. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). "These two steps do not have to be analyzed sequentially; if the law was not clearly established, we need not decide if the Defendants actually violated the Plaintiffs' rights, although we are permitted to do so." *Fils v. City of Aventura*, 647 F.3d 1272, 1287 (11th Cir. 2011).

Kraus challenges two aspects of the district court's qualified immunity ruling. First, as a threshold matter, Kraus contends that the district court misstated three legal standards governing the qualified immunity analysis. Then separately—and more generally—Kraus argues that the officers were not entitled to qualified immunity for their actions because clearly established law should have put them on notice of a constitutional violation. We consider Kraus's contentions in turn.

**A**

6

Kraus asserts that the district court committed three discrete legal errors in its summary judgment order: (1) relying on an unpublished opinion in requiring him to show that the officers acted with a "sadistic or malicious purpose"; (2) relying on the same unpublished opinion in requiring him to cite case law with "indistinguishable facts" in order to show that the law was clearly established at the time of the incident; and (3) applying the wrong standard for interpreting the summary judgment facts in light of the video evidence.

**1**

Kraus first contends that the district court erred by citing to an unpublished decision, *Shuford v. Conway*, 666 F. App'x 811 (11th Cir. 2016), for the proposition that Kraus had to "establish that [the officers] acted with a malicious or sadistic purpose to inflict harm." He argues that the court cited the standard in error, as after the Supreme Court's decision in *Kingsley v. Hendrickson* we now require plaintiffs pursuing an excessive-force claim to show only that the use of force was objectively unreasonable. *See* 135 S. Ct. 2466, 2473 (2015).

Kraus misreads the district court's order. Although it is true that the court cited *Shuford,* it did so merely to state that "[i]n looking at what is clearly established, the Court is bound by the law at the time of the incident," *Shuford*, 666 F. App'x at 817, which is clearly correct. *See, e.g., Anderson v. Creighton*, 483

U.S. 635, 639 (1987) (whether an official is protected by qualified immunity is "assessed in light of the legal rules that were clearly established at the time [the action] was taken") (internal quotation marks omitted).  The district court went on to state that, because the incident giving rise to this suit occurred before the Supreme Court's ruling in *Kingsley*, Kraus would have to show that it was clearly established that the officers' actions were unlawful under the pre-*Kingsley* "sadistic and malicious" standard.  That is a correct statement of the then-prevailing law, and we will not disturb the court's ruling on this ground.

**2**

Kraus next argues that the district court erred by requiring him to provide a case with "indistinguishable facts" in order to show that the officers violated clearly established law.  Kraus again miscasts the district court's ruling.  Although the court did ask his counsel to provide it with a case with "indistinguishable facts," it made clear both at the hearing and in its order that a plaintiff may show that a right is clearly established in three ways: (1) case law with "indistinguishable facts," (2) "a broad statement of principle within the Constitution, statute, or case law that clearly establishes" the right, or (3) "conduct so egregious that a constitutional right was clearly violated," even in the absence of analogous case law.  The court further clarified that the first way of showing a right is clearly established requires only that a plaintiff provide case law that is "materially

8

similar."   Moreover, it is clear from the district court's order that its analysis was not limited to whether Kraus presented case law with "indistinguishable facts"; rather, the order expressly considered and concluded that Kraus failed to satisfy his burden by way of any of the three methods for proving that a right was "clearly established."   Again, this was a correct statement of the law, *see, e.g., Jones v. Fransen*, 857 F.3d 843, 852 (11th Cir. 2017) (describing three ways plaintiff may demonstrate that a right is clearly established), and we see no reason to disturb the district court's ruling on this basis.

**3**

Kraus finally argues that the district court applied the wrong standard for using a video recording as the lens through which to view purportedly disputed facts at the summary judgment stage.  Kraus contends, essentially, that the court was bound to accept his version of the facts unless they were "clearly contradicted" by the video evidence, and that because the court did not make an explicit finding that the video clearly contradicted his account, it must have applied the wrong standard.

The district court was not required to make an explicit finding that the video "clearly contradicted" his account before viewing the facts in light of the recording.  The Supreme Court has held that "[w]hen opposing parties tell two

9

different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380(2007). "For instance, when a video recording exists of the pertinent events—as in this case—we 'view[ ] the facts in the light depicted by the videotape.'" *Jones v. Michael*, 656 F. App'x 923, 926 (11th Cir. 2016) (quoting *Scott*, 550 U.S. at 381). Kraus points to no case law emanating from either the Supreme Court or this Circuit that requires the district court to state explicitly that a video "clearly contradicts" a plaintiff's version of events before viewing facts as having been established by a video recording.

Here, the district court clearly implied, correctly, that the video footage contradicted Kraus's version of events. The court noted that "[t]he parties disagree about whether Plaintiff was being compliant during the booking process" before noting that "the video supports the officers' description of the events." The court then recounted the facts "in the light depicted by the videotape," just as it has been instructed to do by both this Circuit and the Supreme Court. So yet again, we are unpersuaded that the district court's ruling should be disturbed on this basis.

**B**

10

Kraus also asserts that the officers were not entitled to qualified immunity for their actions. The district court determined that qualified immunity was appropriate because Kraus failed to show that the law was clearly established at the time of the incident. We agree.

Kraus contends that the law at the time of the incident clearly established "that an officer may not apply physical force strong enough to cause serious injury when there is no legitimate safety threat and the citizen is compliant." That is correct as far as it goes. However, the rights clearly established by Kraus's cited cases are of no benefit to him here. As one might expect from the wording of his argument, each case that Kraus cites for support involves an appellant who was fully secured and not resisting in any way. *See, e.g.*, *Lee*, 284 F.3d at 1199 (suspect arrested, handcuffed, and completely secured); *Danley v. Allen*, 540 F.3d 1298, 1309 (gratuitous force against a prisoner "who has clearly stopped resisting" unreasonable); *Shuford*, 666 F. App'x at 818 (need for force "had completely subsided"). And in fact, his cases even support the proposition that use of force *may* be necessary to ensure an inmate's compliance. *See, e.g.*, *Ort v. White*, 813 F.2d 318, 325 (11th Cir. 1987) ("Prison officers must … have the authority to use that amount of force or those coercive measures reasonably necessary to enforce an inmate's compliance…") (internal quotation omitted). Because the district court found based on the video evidence—and we agree—that Kraus was non-compliant

11

at the time of the officers' use of force, these cases fail to clearly establish that the officers' actions were unconstitutional at the time of the incident.  The district court, therefore, correctly concluded that they were entitled to qualified immunity.

## III

Kraus next argues that the district court improperly granted summary judgment in favor of Gargan and Sansone on the state-law battery claims.  Under Florida Statute § 768.28(9)(a), no employee of the state will be held liable for a tort unless he "acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property."  Kraus asserts that the derogatory language used against him during the booking process shows that the officers acted in bad faith.  As the district court concluded, however, words alone do not transform an acceptable use of force into one undertaken in bad faith. *See Evans v. Stephens*, 407 F.3d 1272, 1282 (11th Cir. 2005) (holding that it is the totality of the circumstances, and not words alone, that determines whether an action is unconstitutional).  As Kraus did not show that Gargan and Sansone acted in bad faith, the district court correctly held that they were entitled to immunity under Florida Statute § 768.28(9)(a).

## IV

Finally, Kraus contends that the district court erred in granting summary judgment on his claims against Snyder.  Snyder should be liable, Kraus says, because the sheriff's office "routinely acted with deliberate indifference to officer use of force, because the custom and practice of the [sheriff's office] encouraged [the officers'] use of excessive force, and because the [sheriff's office] affirmatively ratified the conduct of [the officers] in this case."

Suing a municipal official in his official capacity—as Kraus has done here—is the functional equivalent of suing the municipality itself.  *Owens v. Fulton Cty.*, 877 F.2d 947, 951 n.5 (11th Cir. 1989).  Municipalities may be found liable under § 1983 only when a plaintiff shows: "(1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004).  "A policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality" and "[a] custom is a practice that is so settled and permanent that it takes on the force of law." *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997) (internal citation omitted).  Thus, in order to prove his claim, Kraus must show that there was a policy or custom of excessive use of force at the Martin County Sheriff's Office.  This he fails to do.

13

Kraus first asserts that Snyder is liable under a ratification theory, which allows a municipality to be held liable when it "actively endors[es] or approv[es] of the conduct of its employees or officials." *Garvie v. City of Ft. Walton Beach, Fla.*, 366 F.3d 1186, 1189 (11th Cir. 2004). However, "[w]hen plaintiffs are relying not on a pattern of unconstitutional conduct, but on a single incident, they must demonstrate that local government policymakers had an opportunity to review the subordinate's decision and agreed with both the decision and the decision's basis before a court can hold the government liable on a ratification theory." *Salvato v. Miley*, 790 F.3d 1286, 1296 (11th Cir. 2015). Here "[t]he sheriff did not review any part of [the officers'] actions before they bec[a]me final, much less approve the decision and the basis for it." *Id.* (internal quotation marks omitted). Kraus therefore may not pursue his claims against Sheriff Snyder under a ratification theory.

Nor can his claim succeed under a theory that the sheriff's office was deliberately indifferent to excessive-force complaints filed against its officers. To show deliberate indifference, "a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998). Kraus argues, essentially, that the sheriff's office knew that it needed to better supervise Sansone because of previous

14

excessive-force complaints against him and that it failed to investigate and follow up on those complaints. The record shows, however, that the sheriff's office investigated each claim made against Sansone and, in the one incident he was found to have used excessive force, suspended him without pay. Gargan had no incidents in which he was found to have used excessive force. The district court, therefore, was correct in concluding that "there are insufficient facts in the record to show that the Sheriff's Office was aware of, and deliberately indifferent to, a custom of using excessive force."

## V

For the foregoing reasons, the judgment of the district court is **AFFIRMED**.

15