**Anthony ORT, Plaintiff-Appellant,**

v.

**Warden J.D. WHITE, Ron Sutton, Tony Holliday, Officer Truman Mitman, Captain Shoemaker and J.W. Taunton, Defendants-Appellees.**

No. 85–7059.

United States Court of Appeals, Eleventh Circuit.

March 27, 1987.

Rehearing and Rehearing En Banc Denied May 5, 1987.

Deborah A. Ellis, American Civil Liberties Union, Women's Rights Project New York City, for plaintiff-appellant.

Thomas R. Allison, Asst. Atty. Gen., Montgomery, Ala., for defendants-appellees.

Before HILL and HATCHETT, Circuit Judges and THOMAS *, Senior District Judge.

HILL, Circuit Judge:

Appellant Anthony Ort, an inmate in the Alabama prison system, appeals from the district court's dismissal of his civil rights action pursuant to 42 U.S.C. § 1983,

---

* Honorable Daniel H. Thomas, Senior U.S. District Judge for the Southern District of Alabama, sitting by designation.

against the warden and various officers of the Stanton Correctional Facility in Elmore, Alabama. Appellant's complaint is based upon two series of incidents during which he alleges that prison officials violated his constitutional rights. First, he asserts that on several occasions a prison officer unconstitutionally denied him water, in violation of both the eighth and fourteenth amendments, when he refused to work on the prison farm squad. Second, appellant claims that his confinement in the prison sallyport in order to implement a disciplinary withdrawal of television privileges also constituted an eighth amendment violation. For the reasons discussed below, we affirm the decision of the district court.

## I. FACTS

The incidents at issue here occurred in August, September and October of 1980, when appellant Ort was confined at the Stanton Correctional Facility. Inmates at Stanton during this period were assigned to farm squads, which performed duties outside the prison's gates such as cleaning ditches and working in the fields and orchards. The magistrate's report discussed the procedures involving these farm squads. On each duty morning, inmates were required to report to the back gate, where farm officers would arrive to escort the prisoners to their determined work sites. Each inmate assigned to farm duties was given a squad number. When the gate officer called a squad number, those inmates would enter the sallyport, line up in columns of two, and proceed out with the farm squad officer. At noon, the farm squad officers would return their squads to the sallyport, and the inmates would eat lunch at the prison. The officers and inmates would repeat this same procedure for the afternoon work session.

In addition to the regular farm squads, Stanton also had a late farm squad for inmates who failed to report to the back gate in time to depart with their regular squads. The late squad did not return to the prison for lunch, but was provided a sack lunch at the work site. The magistrate found that the late squad ordinarily contained a number of "problem inmates," normally those who refused to work with their regular squads. For this reason, the late squad generally worked some distance away from the regular farm squads.

The evidence before the magistrate showed that inmates in each farm squad were required to carry a five-gallon water keg with them to the field each day. The keg required two men to carry it, and inmates in each squad took turns carrying the keg from the prison until they reached their particular work site.

The evidence with respect to appellant Ort showed that in August of 1980 he was on the late squad virtually every day. The magistrate found that he "refused to do any work and that he was basically insubordinate against all authority." The magistrate also found that Ort generally refused to assist the other inmates on the squad in carrying the water keg, and that this refusal irritated the other members of his squad, who frequently displayed an attitude of open hostility toward Ort.

Officer Tony Holladay, Ort's supervisor on the late farm squad during this period, testified before the magistrate that there were times when Ort would be the only inmate on the late squad. On an undetermined number of such occasions, Ort refused to carry to the work site a half-keg of water provided for him alone. Holladay also testified that several times Ort refused to carry his own work tools, and that other inmates had to carry his tools to the field in addition to their own.

The magistrate further found that appellant Ort received a "substantial number" of disciplinaries, or violation reports, for refusing to work while in the field with his squad. On several occasions when he refused to carry the water keg and refused to work, Holladay responded by not allowing him to drink any water until he began to perform his assigned tasks like the rest of his squad. Holladay testified at the evidentiary hearing that he considered such action to be the minimal amount of force necessary to protect Ort and himself from possible retaliation by the other inmates. He testified that Ort's refusal to carry the

water keg and to work caused problems among the other inmates on his squad, some of whom told Holladay that if Ort could refuse to work and still drink the water then they would do the same. In addition, on at least one occasion in the field an inmate threatened to knock Ort in the head with a shovel if the guard allowed Ort to drink from the water keg, which he had not helped to carry.

According to Holladay's testimony, he did not deny Ort water for an entire day as a matter of course; he denied Ort water only during those times when Ort refused to work. Holladay testifed that if on a particular day Ort worked until two hours before quitting time, then he would be denied water only for the two hours during which he actually did not work. The magistrate found that such exchanges occurred not more than four or five times over a period of several months.

Ort received so many official disciplinaries for refusing to work that he lost approximately five years of "good time." In addition, as a result of these disciplinaries appellant twice lost his television privileges, once for twenty-eight days and another time for thirty days. At times while Ort was prohibited from watching television, prison officials placed him in the sallyport to keep him under direct supervision. The sallyport is an outdoor area connected to the prison gate, approximately thirty to forty feet in length, which has a gravel surface and is enclosed by a fence. The magistrate found that on those occasions when Ort was confined in the sallyport he was fed, allowed to use the bathroom, and given adequate clothing.

## II. DENIAL OF WATER

### A. Eighth Amendment Claim

The primary basis of appellant Ort's first claim is that Officer Holladay's denial of water to him on four or five occasions violated his eighth amendment protection against cruel and unusual punishment. Thus, the key issue becomes whether it is "cruel and unusual punishment" for a prison guard to deny water to a single inmate who, at that time, is refusing to perform his share of the work required of his squad. In deciding this question, we first address the general parameters of the prohibition against cruel and unusual punishment.

### 1.

The language of the eighth amendment, that "cruel and unusual punishments [shall not be] inflicted," manifests the general intention to limit the power of those entrusted with the criminal-law function of government. *Whitley v. Albers*, 475 U.S. 312, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986). The amendment today is recognized as proscribing more than simply physically barbarous punishments. *See Estelle v. Gamble*, 429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976). It prohibits the unnecessary and wanton infliction of pain, or the infliction of pain totally without penological justification. *See Rhodes v. Chapman*, 452 U.S. 337, 346, 101 S.Ct. 2392, 2398, 69 L.Ed.2d 59 (1981). The amendment has also been found to proscribe the infliction of punishment grossly disproportionate to the severity of the offense. *See id.; Soto v. Dickey*, 744 F.2d 1260, 1269 (7th Cir.1984), *cert. denied*, 470 U.S. 1085, 105 S.Ct. 1846, 85 L.Ed.2d 144 (1985).

■ Eighth amendment principles apply not only to judicially imposed punishments, but also when conditions of confinement constitute the punishment at issue. *See Rhodes*, 452 U.S. at 347, 101 S.Ct. at 2399. The limitations imposed by the amendment thus provide the proper framework for evaluating challenges to various schemes of prison discipline. Clearly, "[w]hatever rights one may lose at the prison gates, ... the full protections of the eighth amendment most certainly remain in force." *Spain v. Procunier*, 600 F.2d 189, 193–94 (9th Cir.1979).

■ The application of the cruel and unusual punishment clause in the context of prison discipline, however, causes the court to balance important concerns on both sides. To be sure, an inmate must be protected from the "unnecessary and wanton

infliction of pain" by prison officials. Equally compelling though, is the deference normally extended to prison officials in acting to insure the proper administration, safety and security of a penal institution. The Supreme Court has noted that "a prison's internal security is peculiarly a matter normally left to the discretion of prison administrators." *Rhodes,* 452 U.S. at 349 n. 14, 101 S.Ct. at 2400 n. 14. The Court's decisions in this area counsel that prison officials "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979).

■ Thus, in evaluating the challenged conduct of prison officials, a court must keep in mind the paramount concerns of maintaining order and discipline in an often dangerous and unruly environment. Although this deference "does not insulate from review actions taken in bad faith or for no legitimate purpose, it requires that neither judge nor jury freely substitute their judgment for that of officials who have made a considered choice." *Whitley,* 475 U.S. at ——, 106 S.Ct. at 1085. In considering the propriety of a prison security measure, a court therefore should look beyond a "mere dispute over the reasonableness of a particular use of force or the existence of arguably superior alternatives." *Id.* at ——, 106 S.Ct. at 1085–86. To establish a viable eighth amendment claim, the evidence must show that the measure taken inflicted unnecessary and wanton pain and suffering, *see id.* at ——, 106 S.Ct. at 1085, or was totally without penological justification, *see Rhodes,* 452 U.S. at 346, 101 S.Ct. at 2398; *Estelle,* 429 U.S. at 103, 97 S.Ct. at 290.

The question remains how to define an "unnecessary and wanton infliction of pain" in the context of prison discipline. It seems important in this type of case to consider the distinction between, on the one hand, "punishment" in the strict sense and, on the other, immediately necessary coercive measures undertaken to obtain compliance with a reasonable prison rule or regulation. Punishment in the strict sense involves a penalty which is deliberately administered after reflection and evaluation in response to conduct occurring in the past.[1] This strict form of punishment usually is administered to chastise the wrongdoer and to deter him and others from engaging in such unacceptable conduct in the future. Punishment in this sense is not designed to bring an ongoing violation to a halt.

Different considerations apply, however, to an immediate coercive measure undertaken by a prison official, necessitated by a spontaneous violation of a prison rule or regulation. In this scenario the wrongful conduct is currently taking place, and the situation dictates that the prison official undertake immediate action to bring an end to the violation or disturbance. Faced with such sudden wrongful and quite possible harmful conduct, the prison official on the scene does not have the luxury of hindsight and reflection.

The Supreme Court recently addressed one extreme such situation in *Whitley v. Albers,* 475 U.S. ——, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). The claim in *Whitley* arose out of a riot at the Oregon State Penitentiary, where inmates held a prison officer hostage in an upstairs cell. In an effort to rescue the hostage, prison officials formulated a plan calling for the prison security manager to enter the cellblock unarmed, followed by prison officers armed with shotguns. The security manager ordered the officers to fire a warning shot and to shoot low at any inmates climbing the stairs to the upper tier where the hostage was held. The plaintiff was an inmate

---

1. *Cf. George v. Evans,* 633 F.2d 413, 415 (5th Cir.1980) ("Punishment is an action by prison guards or a condition of confinement that is applied to an inmate for a penal or disciplinary purpose and is at least apparently authorized or acquiesced in by high prison officials.");

*Johnson v. Glick,* 481 U.S. 1028, 1032 (2d Cir.), cert. denied, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973) (punishment is an action "deliberately administered for a penal or disciplinary purpose").

who at the time was attempting to move elderly prisoners housed on the lower tier away from the scene of the disturbance. After firing a warning shot and storming the cellblock, the officers fired several shots, which injured some inmates on the lower tier and stairs. One bullet struck the plaintiff in the knee as he started up the stairs.

The Ninth Circuit Court of Appeals held that the plaintiff could recover under 42 U.S.C. § 1983 if he could establish that prison officials carried out the plan with "deliberate indifference" to his right to be free from cruel and unusual punishment. *See Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (deliberate indifference to medical needs of prisoners constitutes cruel and unusual punishment). The Supreme Court, however, reversed. It stated that the deliberate indifference standard should not apply in the context of "decisions involving the use of force to restore order in the face of a prison disturbance." *Whitley,* 475 U.S. at ——, 106 S.Ct. at 1084. The court held that it is

> obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishment Clause.... The *infliction of pain in the course of a prison security measure,* therefore, does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense.

*Id.*

The *Whitley* Court concluded that the question whether a particular prison security measure inflicted unnecessary and wanton pain "ultimately turns on 'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.' *Johnson v. Glick* ....'" *Id.* at ——, 106 S.Ct. at 1085. Following *Johnson,* the Court noted that such factors as the need for the application of force, the relationship between the need and the

amount of force used, and the extent of the injury inflicted are all relevant to the ultimate determination. *See Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973).

Implicit in the *Whitley* analysis is the difference in the constitutionally permissible limits of punishment in the strict sense as opposed to immediately necessary coercive measures undertaken to restore or maintain order and discipline. Surely it would have been cruel and unusual punishment if, *after* the dangerous situation had subsided, the prison officer in *Whitley* had shot the inmate in the knee as punishment for his role in the riot. But because of the gravity of the threatening misconduct and the need for immediate action to halt the misconduct, the Court concluded that in that case such force was necessary and appropriate, and therefore not cruel and unusual punishment.

 Although *Whitley* was decided in the extremely volatile context of a prison riot, its reasoning may be applied to other prison situations requiring immediate coercive action. Of course, the extent of the force used or the severity of the conduct taken by prison officials must be evaluated according to the *Johnson* factors, *i.e.* the need for forceful conduct, the relationship between the need and the amount or type of force used, and the extent of the injury inflicted. Where some immediate action by a prison officer is necessary, however, the conduct should not be deemed to violate the eighth amendment if it was undertaken in a good faith effort to restore order or prevent a disturbance, not maliciously or sadistically, and was reasonable in light of the threat apparent to the officer at the time.

This court's precedent in the area of prison discipline also supports our interpretation of the proper standard by which to evaluate this type of eighth amendment claim. In *Williams v. Kelley,* 624 F.2d 695 (5th Cir.1980), *cert. denied,* 451 U.S. 1019, 101 S.Ct. 3009, 69 L.Ed.2d 391 (1981),[2] this

**2.** The Eleventh Circuit has adopted as precedent all decisions of the former Fifth Circuit ren-

court held that a fatal choke hold applied to a prisoner by prison officers in order to protect their own safety and in a good faith effort to maintain order and discipline did not rise to the level of a constitutional violation actionable under section 1983. Quoting from the district court's findings, the court noted that the situation "necessitated spontaneous reaction, and defendants acted without the benefit of hindsight.... In any event, it is clear that the hold was not used to inflict harm on [plaintiff], but was applied in a good faith effort to maintain or restore discipline." 624 F.2d at 698.

Similarly, in *Smith v. Dooley*, 591 F.Supp. 1157 (W.D.La.1984), *aff'd*, 778 F.2d 788 (5th Cir.1985), the court approved the reasonable use of force to remove a prisoner who refused to leave his cell to be transported to another jail. Citing *Williams v. Kelley*, the court stated that the "application of force by jail officials to protect themselves, and to maintain and restore discipline is appropriate if the application of force is reasonable and made in good faith.... Additionally, prison officials may use reasonable force to move inmates and to ensure compliance with reasonable regulations." *Smith*, 591 F.Supp. at 1168.

The *Smith* court cautioned, however, that "when the necessity for the application of force by jail officials ceases, the continued use of harmful force can be a violation of the Eighth and Fourteenth Amendments." 591 F.Supp. at 1168. The use of force in retaliation for a provocative act by an inmate occurring some time earlier is "more likely to be not an effort to restore order but instead either a motive for 'maliciously' striking the [inmate] 'for the purpose of causing harm' or else summary, informal, unofficial and unsanctioned corporal punishment." *Id.* (quoting *Dailey v. Byrnes*, 605 F.2d 858, 861 (5th Cir.1979)). Thus, although the court in Smith approved the use of reasonable force to remove the recalcitrant prisoner from his cell, it made clear that physical abuse directed at the prisoner *after* he terminated his resistance

to authority would constitute an actionable eighth amendment violation.

In accord with the rationale of these cases are the bulk of cases dealing with the use of tear gas or mace on prisoners. In *Spain v. Procunier*, 600 F.2d 189 (9th Cir. 1979), the court concluded that the use of tear gas "in order to prevent a perceived future danger does not violate 'evolving standards of decency' or constitute an 'unnecessary and wanton infliction of pain.'" 600 F.2d at 196. Although the court refused to sanction the use of tear gas as punishment, it noted that

> use of the substance in small amounts may be a necessary prison technique if a prisoner refuses after adequate warning to move from a cell or upon other provocation presenting a reasonable possibility that slight force will be required. In these circumstances the substance may be a legitimate means for preventing small disturbances from becoming dangerous to other inmates or the prison personnel.

*Id.* at 195.

More recently in *Soto v. Dickey*, 744 F.2d 1260 (7th Cir.1984), *cert. denied*, 470 U.S. 1085, 105 S.Ct. 1846, 85 L.Ed.2d 144 (1985), the Seventh Circuit approved the use of tear gas or mace where necessary to restore prison order and security. The court first made clear that "it is a violation of the Eighth Amendment for prison officials to use mace or other chemical agents in quantities greater than necessary for the sole purpose of punishment or the infliction of pain." 744 F.2d at 1270. The court concluded, however, that the use of "mace, tear gas, or other chemical agent of the like nature when reasonably necessary to prevent prison riots or escape or to subdue recalcitrant prisoners does not constitute cruel and unusual punishment." *Id.*

■ The above cases are consistent with our distinction, for purposes of applying the eighth amendment in the context of prison discipline, between punishment after the fact and immediate coercive measures

dered prior to October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981)

(en banc).

necessary to restore order or security. Prison officials step over the line of constitutionally permissible conduct if they use more force than is reasonably necessary in an existing situation or if they summarily and maliciously inflict harm in retaliation for past conduct. Prison officers must, however, have the authority to use that amount of force or those coercive measures reasonably necessary to enforce an inmate's compliance with valid prison rules and to protect themselves and the other inmates. Thus, where such immediate coercive action is necessary, the conduct of a prison official does not constitute cruel and unusual punishment within the meaning of the eighth amendment if it was undertaken not maliciously or sadistically, but in a good faith effort to restore order or prevent a disturbance, and if the force used was reasonable in relation to the threat of harm or disorder apparent at the time.

### 2.

█ Applying the standard set forth above, we hold that the denial of water to appellant Ort did not constitute cruel and unusual punishment within the meaning of the eighth amendment. This claim thus does not rise to the level of a constitutional tort sufficient to support a section 1983 action.

Ort claims that it was cruel and unusual punishment for Officer Holladay to have denied him water on four or five occasions while he was supposedly "working" on the farm squad. The first step in this inquiry is to determine whether the officer's conduct constituted punishment or instead whether it was an immediately necessary coercive response undertaken to restore or maintain order and discipline on the farm squad. It is clear from these facts that Ort's several refusals to carry the water keg and his selective work stoppages were spontaneous events occurring while his farm squad was out on field duty. The late squad, of which Ort seemed a charter member, remained away from the prison for the entire day, so Officer Holladay had no one to whom he could turn over an unruly or recalcitrant inmate and no way to contain such a troublemaker or segregate

him from the rest of the squad. These conditions distinguish the present situation from being merely the everyday case of an inmate violating a rule or regulation while within the prison walls. This scenario dictated that the lone prison officer present on the scene take some immediate action to maintain order and discipline among the prisoners in the field. Holladay's actions therefore should not be viewed as punishment in the strict sense, but instead as necessary coercive measures undertaken to obtain compliance with a reasonable prison rule, *i.e.* the requirement that all inmates perform their assigned farm squad duties.

As such, the next step is to determine whether the measures were undertaken in good faith or whether the officer acted maliciously with respect to appellant. On this point the evidence shows that Officer Holladay's conduct constituted a good faith effort to restore order and prevent a disturbance. Holladay only denied Ort water when he refused to carry the keg or refused to work. The officer's clear motive was to encourage Ort to comply with the rules and to do the work required of him, after which he would receive the water like everyone else. There simply is no evidence that Officer Holladay acted "maliciously" or "sadistically" toward appellant in denying him water. To the contrary, the officer's actions were undertaken in a good faith effort to bring an end to Ort's ongoing violation of prison rules.

In addition, Officer Holladay's actions were necessary to prevent a possible disturbance by the other inmates on Ort's farm squad. The magistrate found that Ort's general refusal to assist the other inmates in carrying the water keg created an attitude of open hostility toward him. On one occasion another inmate threatened to strike Ort with a shovel if Ort were allowed to drink from the water keg, which he had not helped to carry. Holladay also testified that other inmates threatened that they, too, would refuse to work if Ort could do so and still be allowed to drink the water. Thus, the prison officer faced a disruptive and potentially dangerous situation, compounded by the fact that he was out in the field away from the additional manpower and security of the prison facili-

ty. Given this predicament, Holladay responded in a good faith effort to maintain order and discipline and to protect both Ort and himself.

Finally, we must determine whether the officer's actions were reasonable in relation to the threat apparent to him at the time. It is conceivable that conduct undertaken with a proper motive could be so excessive or severe as to violate the eighth amendment, but such is not the case here. All Ort needed to do before he would be allowed to drink the water was to perform the work required of all the inmates on his farm squad. As in the civil contempt context, appellant essentially had the keys to the water keg in his own pocket. Whenever he agreed to abide by the prison rules, he would be given water just like everyone else. The threat of unrest among the other inmates had Ort succeeded in flouting the rules and the fact that he could obtain the water merely by obeying the rules show that Officer Holladay's conduct was not unreasonable in this situation.

Thus, we hold that the prison officer acted reasonably and in good faith in response to a spontaneous disturbance created by Ort. We acknowledge that we might have reached a different decision if later, once back at the prison, officials had decided to deny appellant water as punishment for his refusal to work. On these facts, however, the officer's conduct constituted permissible coercive discipline and not cruel and unusual punishment.

### B. Fourteenth Amendment Claim

Appellant additionally claims that Officer Holliday's decision to deny him water on those occasions when he refused to work violated his substantive and procedural due process rights under the fourteenth amendment. Ort contends that the guard's actions constituted summary punishment, while under both Alabama law and the Supreme Court's decision in *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), he had a right to be punished only after a disciplinary hearing. Applying the same punishment-coercion analysis we employed with respect to appellant's eighth amendment claim, we similarly reject this due process argument.

■ Prison inmates clearly may claim the protections of the fourteenth amendment, and they may not be deprived of life, liberty, or property without due process of law. *Wolff*, 418 U.S. at 556, 94 S.Ct. at 2974 (citations omitted). However, as the Supreme Court has indicated,

the fact that prisoners retain rights under the Due Process Clause in no way implies that these rights are not subject to restrictions imposed by the nature of the regime to which they have been lawfully committed.... In sum, there must be a mutual accomodation between institutional needs and objectives and the provisions of the constitution that are of general application.

*Id.* (citations omitted). Although the due process clause generally applies to prison disciplinary actions, its protections are not absolute, and they must be evaluated in the context of the needs and exigencies of the institutional environment. *See id.* at 555, 94 S.Ct. at 2974; *see also United States ex rel. Gereau v. Henderson*, 526 F.2d 889, 895 (5th Cir.1976) (prisoners enjoy protections of due process clause subject to restrictions imposed by practical necessities of prison life and legitimate aims of correctional process.)

■ In the present case, Officer Holladay admittedly did not follow the usual procedures of filing a disciplinary report and conducting a disciplinary hearing before taking action against appellant Ort. This situation, however, was not the usual case of an inmate inside the prison violating a rule or regulation. Officer Holladay was alone in the field supervising an inmate work squad when he was confronted with a spontaneous disruption by one of the prisoners in his group. Because the work squad was to be away from the prison for the entire day, the officer had to take some action to maintain discipline and control until the squad returned to the security of the prison grounds. Only after the squad returned to the prison would Officer Holladay even have had the opportunity to file a report and institute formal proceedings. Appellant's position would leave guards powerless to undertake any coercive response to a prisoner's disorderly

conduct at the scene of the disturbance. We refuse to tie the hands of prison officers by not allowing them to take reasonable, immediately necessary action in response to inmate misconduct which occurs outside the prison walls.[3]

Once again we emphasize the distinction between punishment in the strict sense and immediately necessary coercive measures undertaken either to obtain compliance with a valid prison rule or in response to a spontaneous disturbance. Clearly, appellant would have a legitimate due process claim if, after the misconduct or disturbance had abated, prison officials had summarily denied him water or imposed any other form of punishment without first affording him some type of disciplinary hearing. A fourteenth amendment violation occurs in this context where prison officers continue to employ force or other coercive measures after the necessity for such coercive action has ceased. *See Smith v. Dooley,* 591 F.Supp. at 1168. Holladay's actions, however, were undertaken in response to ongoing misconduct by appellant. Moreover, Holladay had no way to segregate or contain the disorderly inmate until such time when officials could convene a formal hearing. Although we stress that our decision here is a narrow corollary to the general rule that prison inmates may not be punished without first being afforded a disciplinary hearing, the "needs and exigencies of the institutional environment," *Wolff,* 418 U.S. at 555, 94 S.Ct. at 2974, dictate that prison officers may sometimes be required to take reasonable coercive action before it is possible to conduct such formal proceedings.

### III. CONFINEMENT IN THE SALLYPORT

Appellant's other claim relates to his loss of television privileges and his confinement in the sallyport. Ort alleges that prison officials "sentenced" him to the sallyport for portions of 58 consecutive days to keep him from watching television. Such primitive conditions of confinement, he argues, constitute cruel and unusual punishment in violation of the eighth amendment.

In order to reach the constitutional question here, we first would have to determine that the magistrate's findings of fact, as adopted by the district court, are clearly erroneous. The magistrate found that, contrary to appellant's assertions, Ort was not constantly confined to the sallyport by prison officials. Instead, the magistrate

3. In *Hughes v. Rowe,* 449 U.S. 5, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980), the Supreme Court impliedly recognized that emergency conditions can justify actions which otherwise might violate the due process protections of the fourteenth amendment. The Court ultimately concluded that an inmate's allegation that he was unjustifiably placed in segregation without a prior hearing adequately stated a due process claim. In reaching this result, however, the court reasoned:

Segregation of a prisoner without a prior hearing may violate due process if the postponement of procedural protections is not justified by apprehended emergency conditions.... There is no suggestion in the record that immediate segregation was necessitated by emergency conditions.... In the absence of any showing that concern for institutional security and safety was the basis for immediate segregation of petitioner without a prior hearing, [a prison regulation authorizing such segregation] does not justify dismissal of petitioner's suit for failure to state a claim.

*Hughes,* 449 U.S. at 11–12, 101 S.Ct. at 177.

Implicit in this analysis is the recognition that in some cases emergency conditions can justify the postponement of due process protections.

It is unclear what the *Hughes* Court meant by the term "emergency conditions." Although appellant's case does not present the type of life-threatening emergency situation as in *Whitley,* we think that the situation which confronted Officer Holladay was sufficiently threatening to merit the application of a similar rationale. The guard was by himself and responsible for supervising an inmate squad which was working outside the confines of the prison. In such a precarious situation, even a single prisoner flouting prison rules and refusing to work like the rest of the squad could create a threatening and possibly emergency situation for the prison officer. Had Hollaway not dealt in some way with appellant's insubordination, Ort's defiant attitude could easily have spread to the other prisoners on the work squad, thereby creating an even greater danger of injury or escape. In fact, the magistrate specifically found that several inmates told Holladay that they, too, would refuse to follow his orders if Ort could do so with impunity. These conditions were sufficiently serious to justify the postponement of any applicable due process protections so long as the threat or emergency continued to exist, *i.e.* until the inmates were back securely within the prison walls.

**328**

found that appellant was allowed "freedom of the camp" unless he went into the television areas during those times when prison officials had revoked his television privileges. Only if he was caught in the television areas when he was not authorized to be there was Ort placed in the sallyport. The magistrate further found that during those times when appellant was placed in the sallyport he received food, bathroom privileges, and sufficient clothing.

 We conclude that the findings of fact with respect to Ort's confinement in the sallyport are not clearly erroneous. Prison officials placed him in the sallyport only when he attempted to circumvent the disciplinary order revoking his television privileges.[4] Thus, this claim is also without merit and will not support a section 1983 action.

AFFIRMED.

* Honorable Daniel H. Thomas, Senior U.S. District Judge for the Southern District of Alabama, sitting by designation.

4. In addition, appellant's sallyport claim is meritless to the extent he complains of his confinement in the sallyport each work day between breakfast and the time the late squad departed. Such action was a legitimate effort to make sure that Ort was present for his work detail, after he repeatedly refused to appear on time.