[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-12129
Non-Argument Calendar
_____

D.C. Docket No. 1:13-cv-00524-RWS

VANCE R. JOHNSON,

Plaintiff-Appellant,

versus

SHERIFF R.L. BUTCH CONWAY,
CHRISTOPHER REVELS,
SO#692,
ROBERT BAILEY,
SO#893,
TOCHI DAVIS,
SO#1145,
CORIZON HEALTH, INC.,
a.k.a. Corizon, Inc.,

Defendants-Appellees,

C. LUCAS, et al.,

Defendants.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(May 15, 2017)

Before TJOFLAT, WILLIAM PRYOR, and ROSENBAUM, Circuit Judges.

PER CURIAM:

Vance Johnson filed this civil-rights lawsuit under 42 U.S.C. § 1983 and Georgia state law arising out of his detention at the Gwinnett County Jail in February 2011. Johnson claims that medical staff administered a test for tuberculosis without his consent and that detention officers disciplined him and used excessive force against him in retaliation for his refusal to consent to the test. Pertinent to this appeal, Johnson sued Deputies Christopher Revels, Robert Bailey, and Tochi Davis ("the detention officers" or the "officers"), asserting federal-law claims of excessive force under the Fourteenth Amendment and state-law claims of battery; Sheriff R.L. Butch Conway, asserting that Conway was liable as a supervisor under § 1983 for maintaining a policy which allowed excessive force to be used; Nurse Susan Fajardo, asserting a federal-law claim of First Amendment retaliation and state-law claims of medical negligence and battery; and Corizon Health, Inc. ("Corizon"), Fajardo's employer, asserting a state-law claim of vicarious liability.

The district court granted summary judgment to the detention officers and the Sheriff (collectively, the "County defendants"), concluding that the detention officers were protected by qualified immunity under federal law and by official immunity under Georgia state law and that the Sheriff was not liable as a supervisor under § 1983. The claims against Fajardo and Corizon (collectively, the "medical defendants") were tried before a jury, which returned a verdict in their favor.

On appeal, Johnson contends that sufficient evidence precluded summary judgment on his claims against the County defendants and that the district court gave an erroneous jury instruction for his medical-negligence claim against the medical defendants. After careful review, we agree with the district court that the detention officers were entitled to qualified and official immunity and that the Sheriff is not liable as a supervisor, and we conclude that Johnson has not established plain error regarding the jury instruction. Accordingly, we affirm.

## I. Factual Background

The relevant facts, presented in the light most favorable to Johnson for purposes of reviewing the summary-judgment ruling, are these. *See Moore v. Pederson*, 806 F.3d 1036, 1041 (11th Cir. 2015), *cert. denied*, 136 S. Ct. 2014 (2016). Johnson was arrested and booked into the Gwinnett County Jail in February 2011. During the admission process, he underwent medical screening by

nurses employed by Corizon, which had contracted to provide medical services at the jail. Johnson was asked to sign a form consenting to receive medical treatment while detained at the jail. Believing that he would soon be released, Johnson stated that he would not require medical treatment and refused to sign the consent form. Instead, Johnson signed a Refusal of Clinical Services form.

After Johnson signed the refusal form, detention officers and nurses made multiple attempts to give Johnson a pure protein derivative test ("PPD test") to test for the presence of tuberculosis. In a PPD test, a small needle is inserted just underneath the skin. The PPD test is part of the admission process for the jail in order to control the spread of tuberculosis, which is highly contagious. Johnson refused the PPD test three times.

At some point, Nurse Fajardo made a fourth attempt to administer the PPD test to Johnson. Johnson sat in front of Fajardo, who told him to put his arm down, wiped off his arm, and administered the PPD test. According to Johnson, he told Fajardo that he had signed a refusal-of-medical-treatment form, but she administered the test, anyway. Fajardo testified that she was unaware of Johnson's refusal-to-consent form and that he had verbally consented to the test.

A few hours later, Fajardo asked Johnson to sign documentation stating that he had authorized the jail to give him the PPD test only. Johnson refused to sign the form. Fajardo conferred with Deputy Revels, who was in the room at the time.

4

Revels came over and told Johnson that "he was going to jump on [Johnson's] ass" if Johnson did not sign the paperwork. Revels also threatened to call the "attack squad," apparently referring to the Jail's Rapid Response Team ("RRT"), and warned that Johnson would receive a "failure to comply" disciplinary report if he refused to sign the document. Johnson steadfastly refused to sign the form.

Ultimately, Revels did not call the RRT. Instead, Revels spoke with his supervisor, who advised that Johnson would have to receive a disciplinary report for failure to comply if he did not sign. At the supervisor's instruction, Revels asked two detention officers, Deputies Bailey and Davis, to move Johnson from his cell to the disciplinary unit. Revels told them that Johnson "had refused to sign some medical paperwork and was being charged with a failure to comply infraction." Revels also told them that Johnson was compliant and not resistant.

Gwinnett County Department of Corrections's standard practice for moving an inmate to the disciplinary unit for failure to comply with an officer's instructions involves having the inmate get down on the floor and put his hands behind his back so that he can be handcuffed. The escorting officers then assist the inmate to his feet and escort him to the assigned destination at the inmate's pace. Davis explained that a detainee who is being transferred for discipline is walked backward so he cannot see where he is going. Davis stated that deputies on either side of the detainee walk arm in arm with the detainee as he is being transferred.

5

Bailey and Davis instructed Johnson to lie face down on the floor with his hands behind his back. Johnson complied, and the deputies handcuffed him and then pulled him up from the ground. Johnson testified that they put the handcuffs on so tight that his hands started feeling numb. Johnson stated that "[b]oth of them just grabbed [him], started bending [his] arms all the way back, bending [his] wrist, dislocating [his] arm from [his] shoulder, [and] started dragging [him]." Though Johnson testified that he was "dragged" backward by the deputies throughout the jail, he also indicated that he was able to stay on his feet. Bailey and Davis took Johnson to a solitary-confinement cell. The officers both described the transfer as uneventful and in accordance with normal procedures.

Besides the above descriptions, Johnson's testimony is not clear on the precise details of the deputies' actions, but Johnson testified that the actions caused him "excruciating pain." Johnson stated that he received medical treatment after he was released from jail and that he was diagnosed with a shoulder injury. Based on the pain and injury he experienced, Johnson argues that a reasonable jury could infer that the deputies used excessive force against him.

Conway has been Sheriff of Gwinnett County since 1997. He is responsible for the overall administration of the Sheriff's Office, including the jail. The jail's Use of Force Policy directs staff to "use only that force which is necessary to maintain the security and safety" of all persons within the jail. The policy

6

authorizes detention officers to use certain levels of force to ensure that inmates comply with lawful orders or directions. The policy also directs staff to avoid resorting to physical force if possible. The defendants acknowledged that a detention officer would violate the Use of Force Policy if he were to "use force to make an inmate sign a document he had a right to refuse to sign."

## II. Procedural History

Johnson filed suit in the United States District Court for the Northern District of Georgia in February 2013. He filed the operative second amended complaint in September 2013.[1] The district court granted summary judgment to the detention officers (Revels, Davis, and Tochi), finding that they were entitled both to qualified immunity with respect to Johnson's § 1983 excessive-force claims under the Fourteenth Amendment and to official immunity with respect to his battery claims under Georgia state law. As for Johnson's § 1983 claim against Sheriff Conway, the court concluded that Johnson's claim amounted to one based on *respondeat superior*, which is not a viable theory of supervisor liability under § 1983.

---

[1]    Besides the claims at issue in this appeal, Johnson raised additional claims in the district court, including claims of negligence and First Amendment retaliation against Revels, Bailey, and Davis, an excessive-force claim against Fajardo, and similar claims against another nurse. Johnson does not address these claims on appeal, so we deem them abandoned. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680 (11th Cir. 2014) (issues not raised on appeal are abandoned).

The district court denied summary judgment to the medical defendants, finding genuine issues of material fact as to whether Fajardo obtained Johnson's consent before administering the PPD test.  Johnson's claims against these defendants were tried before a jury over two days.

On the second day of trial, the jury retired to begin its deliberations after receiving its instructions from the district court.  Soon after, Johnson's counsel raised for the first time the issue of whether the medical negligence instruction should be amended.  The instruction, to which counsel appears to have jointly agreed at the charge conference, told jurors that expert testimony was necessary to establish causation.  Counsel stated that expert testimony was not necessary in this case because the issue to be tried was simply the factual question of consent.  Nevertheless, counsel acknowledged that the instruction was "a correct statement of the law" and "probably not error per se," and he did not request any corrective action at that time.  Rather, counsel merely suggested that they "might need to think about how to deal with it" if the jury comes back with a question.

Later, when the jury sent a note asking for clarification of the negligence instruction, Johnson's counsel asked the court more directly to remove the language about expert testimony when giving the jury a rephrased instruction.  The court denied the request, expressing concern about changing the instruction after the jury had begun its deliberations.  The jury returned a verdict in favor of Fajardo

and Corizon on all claims.  Following entry of judgment, Johnson brought this appeal.

We address separately the claims against the County defendants and the claims against the medical defendants.

### III.  Claims against the County Defendants

We review *de novo* a district court's grant of summary judgment, including on grounds of qualified immunity.  *Holmes v. Kucynda*, 321 F.3d 1069, 1077 (11th Cir. 2003).  Summary judgment is appropriate only when the moving party demonstrates that no disputed issue of material fact exists.  *Carter v. Butts Cty., Ga.*, 821 F.3d 1310, 1318 (11th Cir. 2016).   In reviewing a ruling on a summary-judgment motion, we accept the non-movant's version of the facts as true and draw all reasonable inferences in his favor.  *Id.*  We may affirm a district court's grant of summary judgment on any ground supported by the record, even if that ground was not relied on by the district court.  *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013).

### A.     *Section 1983 Claim for Excessive Force under Fourteenth Amendment*

#### 1.     Nature of the Claim

Johnson claims that Deputies Revels, Bailey, and Davis used excessive force against him while he was detained at the Gwinnett County Jail following his arrest. The Supreme Court instructs that in deciding whether force deliberately used

against a pretrial detainee is constitutionally excessive in violation of the Fourteenth Amendment, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley v. Hendrickson*, 576 U.S. ___, 135 S. Ct. 2466, 2473 (2015). A showing of the officer's state of mind or subjective awareness that the force was unreasonable is not required in this analysis. *See id.* at 2472–73. Thus, the standard we previously used to determine whether a defendant used excessive force under the Fourteenth Amendment—which required the plaintiff to show that the defendant applied the force "maliciously or sadistically for the very purpose of causing harm," *see Bozeman v. Orum*, 422 F.3d 1265, 1271 (11th Cir. 2005)—has been abrogated by *Kingsley*.

The Supreme Court instructs that "objective reasonableness turns on the facts and circumstances of each particular case." *Kingsley*, 135 S. Ct. at 2473 (internal quotation marks omitted). Considerations bearing on the reasonableness of the force used include "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Id.* The objective-reasonableness determination must be made "from the perspective of a reasonable officer on the scene," and it

10

must account for the legitimate interests of the institution by "appropriately deferring to 'policies and practices that in th[e] judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security.'" *Id.* (quoting *Bell v. Wolfish*, 441 U.S. 520, 540, 547 (1979)).  A pretrial detainee can prevail by showing "that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." *Id.* at 2473–74.

    2.    Qualified Immunity

A public official sued in his or her individual capacity may assert the defense of qualified immunity.  Qualified immunity aims to strike a balance between "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  The defense generally protects government officials engaged in job duties from individual liability unless they violate "clearly established [federal] statutory or constitutional rights of which a reasonable person would have known." *Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir. 2013) (alteration in original) (internal quotation marks omitted).  The protection is for "all but the plainly incompetent or one who is knowingly violating the federal

law." *Carter*, 821 F.3d at 1319 (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)).

Officials asserting qualified immunity must first establish that they were acting within the scope of their discretionary authority at the time of the alleged misconduct. *Id.* There is no dispute that Revels, Bailey, and Davis met their burden in this regard. Thus, the burden shifted to Johnson to overcome the defense of qualified immunity by showing "both that the officer's conduct violated a constitutionally protected right and that the right was clearly established at the time of the misconduct." *Id.*; *see Pearson*, 555 U.S. at 232. The requirement that the right be "clearly established" ensures "that a reasonable official would understand that what he is doing violates that right." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (internal quotation marks omitted). "We may consider whether the plaintiff has satisfied his burden in any order." *Carter*, 821 F.3d at 1319.

### 3.    Discussion

Here, like the district court, albeit for different reasons, we do not reach the question of whether Johnson's constitutional rights were violated because he has not shown that the detention officers violated a clearly established right. *See Feliciano*, 707 F.3d at 1252.

We evaluate whether a right was clearly established "in light of the specific context of the case, not as a broad general proposition." *Coffin v. Brandau*, 642

12

F.3d 999, 1013 (11th Cir. 2011) (*en banc*) (internal quotation marks omitted).

Therefore, "[f]or the law to be 'clearly established,' case law must ordinarily have

been earlier developed in such a concrete and factually defined context to make it

obvious to all reasonable government actors, in the defendant's place, that what he

is doing violates federal law." *Priester v. City of Riviera Beach, Fla.*, 208 F.3d

919, 926 (11th Cir. 2000). If there is no precedent that, in factual terms, has staked

out a "bright line," the defendant is usually entitled to qualified immunity. *Hoyt v.

Cooks*, 672 F.3d 972, 977 (11th Cir. 2012).

Because excessive-force claims are inherently fact specific, "generally no

bright line exists for identifying when force is excessive; we have therefore

concluded that unless a controlling and materially similar case declares the

official's conduct unconstitutional, a defendant is usually entitled to qualified

immunity." *Priester*, 208 F.3d at 926. Put differently, "[c]oncrete facts are

generally necessary to provide an officer with notice of the hazy border between

excessive and acceptable force." *Fils v. City of Aventura*, 647 F.3d 1272, 1291

(11th Cir. 2011) (internal quotation marks omitted).

Identifying a materially similar case is not the only way to show that a right

is clearly established, however. Occasionally, "[a]uthoritative judicial decisions

may establish broad principles of law that are clearly applicable to the conduct at

issue." *Singletary v. Vargas*, 804 F.3d 1174, 1184 (11th Cir. 2015) (internal

13

quotation marks omitted); *see Coffin*, 642 F.3d at 1014–15 (stating that a "general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question").  But "if a broad principle in case law is to establish clearly the law applicable to a specific set of facts facing a governmental official, it must do so 'with obvious clarity' to the point that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted." *Vinyard v. Wilson*, 311 F.3d 1340, 1351 (11th Cir. 2002).  In excessive-force cases, the plaintiff "must show that the official's conduct was so far beyond the hazy border between excessive and acceptable force that [the official] had to know he was violating the Constitution even without caselaw on point." *Priester*, 208 F.3d at 926–27 (alteration in original) (internal quotation marks omitted).

Johnson expressly does not rely on a controlling and materially similar case to show that the detention officers' conduct clearly violated his right to be free from excessive force.  Instead, he asserts that this Court's case law clearly established a broader principle of law that applies with obvious clarity in this case.

As Johnson indicates, we have established that "[p]rison officials step over the line of constitutionally permissible conduct if they use more force than is reasonably necessary in an existing situation or if they summarily and maliciously inflict harm in retaliation for past conduct." *Ort v. White*, 813 F.2d 318, 325 (11th

14

Cir. 1987).  *Ort* also established that a constitutional violation "occurs . . . where prison officers continue to employ force or other coercive measures after the necessity for such coercive action has ceased."  *Id.* at 327; *see also Danley v. Allen*, 540 F.3d 1298, 1309 (11th Cir. 2008) ("Once a prisoner has stopped resisting there is no longer a need for force, so the use of force thereafter is disproportionate to the need."); *Williams v. Burton*, 943 F.2d 1572, 1576 (11th Cir. 1991) ("The basic legal principle is that once the necessity for the application of force ceases, any continued use of harmful force can be a violation of the Eighth and Fourteenth Amendments.").[2]

---

[2] *Kingsley* was decided after the incident giving rise to this case and so is not directly relevant to the inquiry of whether the law was "clearly established at the time of the misconduct."  *See Carter*, 821 F.3d at 1319.  For this inquiry we look to our pre-existing law, which applied the subjective-malice standard abrogated by *Kingsley*.  *See id.*  The district court concluded that, because the evidence was insufficient to meet the subjective standard (and therefore to prove a constitutional violation under the prior precedent), the officers could not have been on notice that their conduct was unlawful.

Appearing to concede that he cannot meet the subjective-malice standard, Johnson contends that *Kingsley* "did nothing to change the standard of conduct for detention officers" and that pre-existing law in this Circuit clearly established an objective standard of conduct that applies with obvious clarity in this case.  *See Kingsley v. Hendrickson*, 801 F.3d 828, 832–33 (7th Cir. 2015) (holding that "*before and after* the Supreme Court's decision in [*Kingsley*], the standards for the amount of force that can be permissibly employed remain the same").  For instance, since before the time of this incident, as both parties appear to agree, this Circuit applied the same objective factors to Fourteenth Amendment excessive-force claims as the Supreme Court articulated in *Kingsley*.  *See Cockrell v. Sparks*, 510 F.3d 1307, 1311 (11th Cir. 2007).  Likewise, the broad principles of law articulated in *Ort*, *Danley*, and *Williams*, are largely the same as those articulated in *Kingsley*.  Accordingly, we assume without deciding that Johnson is correct that an objective standard of conduct was clearly established by pre-existing case law.  *Cf. Kingsley*, 135 S. Ct. at 2474–75 (explaining that "the use of an objective standard adequately protects an officer who acts in good faith").  It makes no difference to the ultimate outcome, however, because Johnson has not shown that the broad principles of law on which he relies clearly established the objective unreasonableness of the detention officers' conduct, nor

Here, the facts construed in Johnson's favor show that Bailey and Davis tightly handcuffed a compliant Johnson, causing his hands to go numb, and pulled him up off the ground in order to transport him to a disciplinary cell for a failure-to-comply infraction. According to Johnson, "[b]oth of them just grabbed [him], started bending [his] arms all the way back, bending [his] wrist, . . . [and] started dragging [him]." This caused Johnson "excruciating pain" because it felt as if the officers were "dislocating [his] arm from [his] shoulder." He received medical treatment for his shoulder upon his release from jail.

Johnson has not shown that every reasonable officer would conclude that the force used was plainly unlawful "in light of the specific context of the case, not as a broad general proposition." *Coffin*, 642 F.3d at 1013; *see Priester*, 208 F.3d at 926–27. First, the force used was related to a legitimate institutional objective. Johnson had been charged with a disciplinary infraction for failure to comply. For that infraction, as Johnson acknowledges, jail policies instructed that he be handcuffed and escorted by detention officers during transfer to another part of the jail. *See Bell*, 441 U.S. at 547 (stating that courts should defer to the policies and practices that in the judgment of jail officials are needed to maintain order and institutional security); Appellant's Br. at 15 ("[T]he deputies were authorized by

---

has he shown that the evidence is sufficient to meet the subjective "malicious or sadistic" standard.

16

policy to use force to move Johnson from his cell . . . to disciplinary segregation."). To effectuate that transfer, the detention officers, as he admits, were permitted to use some degree of force or coercive measures. *See* Appellant's Br. at 14 ("[S]ome minimal use of force might have been appropriate in response to Johnson's alleged disciplinary infraction."). Nothing in the record indicates that the officers used force other than during the process of moving him. Accordingly, the officers did not use force "after the necessity for such coercive action ha[d] ceased." *See Ort*, 813 F.2d at 327.

To the extent Johnson attempts to show that the detention officers acted with malicious intent, so as to satisfy our old subjective "malicious or sadistic" standard, we are unpersuaded. Even assuming some of Revels's comments to Johnson—threatening to call the "attack squad" and to "jump on [his] ass"—could be construed as malicious, Revels himself did not use any force against Johnson. Only Bailey and Davis did. Nor is there evidence that Revels directed Bailey and Davis to do anything other than transfer Johnson because he was being charged with a disciplinary infraction for "refus[ing] to sign some medical paperwork." Moreover, Bailey's and Davis's conduct was broadly consistent with established prison procedures for transferring detainees for disciplinary infractions. *See Sims v. Mashburn*, 25 F.3d 980, 986 (11th Cir. 1994) ("[C]ompliance with established

prison procedures . . . is evidence of the exercise of 'good faith'"). Accordingly, the record does not support a finding that Bailey and Davis acted in bad faith.

Nor has Johnson shown that the amount of force used was clearly excessive in relation to the need for such force. *See Ort*, 813 F.2d at 325; *Bell*, 441 U.S. at 538. Plainly the need for force was low because Johnson was not resisting and, as the County defendants acknowledge, he "did not pose a physical threat to the deputies." And Johnson's testimony that he was handcuffed tightly, suffered a shoulder injury, and experienced "excruciating pain" from the detention officers' conduct certainly suggests that the officers were rougher than they needed to be under the circumstances. Johnson contends that based on this testimony, particularly about his injury, a jury could find that the force used was excessive.[3]

However, we cannot conclude that the detention officers' "conduct was so far beyond the hazy border between excessive and acceptable force that [the officers] had to know [they] w[ere] violating the Constitution even without caselaw on point." *See Priester*, 208 F.3d at 926 (internal quotation marks omitted). As mentioned above, Johnson does not dispute that some "minimal use of force might have been appropriate in response to Johnson's alleged disciplinary infraction," despite his lack of resistance. *See Fennell v. Gilstrap*, 559 F.3d 1212, 1218 (11th

---

[3] Johnson's speculative inferences from the detention officers' testimony—that they denied using force at all because they knew that the force used was excessive—are insufficient to create a triable issue.

Cir. 2009) ("[O]ur precedent permits the use of force even when a detainee is not physically resisting."). While the extent of injury is relevant to the excessive-force analysis, permissible levels of force may nevertheless cause some pain and injury. *See Cockrell v. Sparks*, 510 F.3d 1307, 1311 (11th Cir. 2007) (open-handed shove of boisterous inmate was reasonable even though the inmate suffered "relatively extensive" injuries); *cf. Brown v. City of Hunstville, Ala.*, 608 F.3d 724, 740 (11th Cir. 2010) (stating, in the related context of Fourth Amendment excessive-force claims arising out of arrests, that "[f]or even minor offenses, permissible force includes physical restraint, use of handcuffs, and pushing into walls."); *Rodriguez v. Farrell*, 280 F.3d 1341, 1351–52 (11th Cir. 2002) ("Painful handcuffing, without more, is not excessive force in cases where the resulting injuries are minimal.").

Here, it is reasonable to expect that the normal way in which detainees at the Gwinnett County Jail were transferred for disciplinary infractions—being handcuffed and walked backward arm in arm with detention officers—would cause some pain and discomfort to the detainee. And Johnson's testimony does not provide any specific details about the deputies' actions that could distinguish reasonable coercive measures from an excessive use of force. *See Walker v. Darby*, 911 F.2d 1573, 1576–77 (11th Cir. 1990) (party opposing summary judgment "must set forth specific facts showing that there is a genuine issue for trial"); *cf. Davis v. Williams*, 451 F.3d 759, 767–68 (11th Cir. 2006) (holding that

19

force used during an arrest was excessive where "there were at least three incidents of [the officer] intentionally grabbing, pushing, or pulling [the plaintiff's] shoulder—after he was handcuffed and after [the plaintiff] informed [the officer] that he had a sore shoulder—and forcing him to the ground by intentionally applying stress to the shoulder"). The relatively minor nature of the injury—a muscle strain accompanied by "excruciating pain"—does not, on this record, compel a conclusion that the detention officers' conduct was obviously unlawful.

It bears repeating that "generally no bright line exists for identifying when force is excessive; we have therefore concluded that unless a controlling and materially similar case declares the official's conduct unconstitutional, a defendant is usually entitled to qualified immunity." *Priester*, 208 F.3d at 926. No "materially similar case" declares the detention officers' conduct unconstitutional, and the broad principles of law on which Johnson relies do not apply with "obvious clarity" to the specific situation facing the detention officers. *See Vinyard*, 311 F.3d at 1351.

Because Johnson has not shown that the detention officers violated a clearly established right in the specific context of this case, we affirm the grant of qualified immunity to Revels, Bailey, and Davis.

## B.    *Supervisory Liability of the Sheriff under § 1983*

Next, Johnson contends that Sheriff Conway is liable as a supervisor because a reasonable jury could find a causal connection between the use of excessive force against him and the jail policy allowing detention officers to discipline detainees for refusing to sign a medical form that they have a right to refuse to sign.

Supervisors cannot be held liable under § 1983 on the basis of vicarious liability or *respondeat superior*. *Keith v. DeKalb Cty., Ga.*, 749 F.3d 1034, 1047 (11th Cir. 2014). "Instead, to hold a supervisor liable a plaintiff must show that the supervisor either directly participated in the unconstitutional conduct or that a causal connection exists between the supervisor's actions and the alleged constitutional violation." *Id.* at 1047–48. A plaintiff may prove such a causal connection in several ways, including, as Johnson claims here, when the supervisor's policy or custom results in deliberate indifference to constitutional rights. *Id.* at 1048. The standard for holding a supervisor individually liable for the actions of a subordinate is "extremely rigorous." *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003).

To establish deliberate indifference of a supervisor, the plaintiff must show that the supervisor disregarded a known, substantial risk of harm to an inmate. *See Keith*, 749 F.3d at 1047–48. Johnson claims that the Sheriff's policies created a risk that excessive force would be used in circumstances where no discipline

21

should even have been imposed. But the jail policies themselves do not authorize discipline for refusing to consent to medical treatment or authorize force, let alone excessive force, when a detainee exercises the right to refuse medical treatment. Moreover, Johnson has produced no evidence establishing Sheriff Conway's subjective knowledge either that the policies permitted discipline for exercising a right or that such discipline would be carried out with excessive force, in violation of the Use of Force policy. *See id.* at 1049. As far as the evidence in this case shows, this was an isolated and unusual incident where a detainee refused to provide written consent after medical staff had administered a necessary test for tuberculosis as part of the jail's intake procedures.

Because Johnson has not shown that the Sheriff was subjectively aware of a substantial risk that excessive force would be used against inmates simply for exercising their right to refuse medical treatment, he has not established that the Sheriff was deliberately indifferent to his constitutional rights.[4] Accordingly, Sheriff Conway is not liable as a supervisor under § 1983, and we affirm the grant of summary judgment in his favor.

---

[4] We note, however, that the jail's policies may now be constitutionally suspect in one respect. In *Jacoby v. Baldwin County*, 835 F.3d 1338 (11th Cir. 2016), we held that pretrial detainees may not be placed in disciplinary segregation without first having been afforded a due-process hearing. *Id.* at 1347–49. Thus, Johnson's immediate transfer to solitary confinement after being charged with a disciplinary infraction appears to contravene the holding of *Jacoby*. Nevertheless, Johnson does not raise a due-process claim in this appeal, and, as *Jacoby* makes clear, the law in this regard was not clearly established at the time of the incident. So, even if he had raised such a claim, the Sheriff (along with the detention officers acting pursuant to that policy), would still be entitled to qualified immunity.

22

## C.    *Battery under Georgia State Law*

Finally, Johnson argues that reasonable jurors could find that Revels, Bailey, and Davis committed a battery against him.  The defendants respond that they are entitled to official immunity under Georgia state law.

Georgia law provides state officers and employees with "official immunity," which means that they are generally "immune from individual liability for discretionary acts undertaken in the course of their duties and performed without willfulness, malice, or corruption." *Reed v. DeKalb Cty.*, 589 S.E.2d 584, 587 (Ga. Ct. App. 2003).  An arresting officer is not liable unless he "act[ed] with actual malice or with actual intent to cause injury in the performance of [his] official functions."  Ga. Const. Art. 1, § 2, ¶ IX(d); *Reed*, 589 S.E.2d at 588.  "Actual malice" means "a deliberate intention to do wrong."  *Merrow v. Hawkins*, 467 S.E.2d 336, 337 (Ga. 1996).

Here, the detention officers are entitled to official immunity.  As discussed above, Bailey and Davis were permitted to use some degree of physical coercion during the process of transporting Johnson for a disciplinary violation, and the record does not support a finding that these officers acted with a deliberate intention to do wrong or cause harm.  Moreover, Johnson's testimony reflects that Revels did not use any force against him, so his state of mind is largely irrelevant; but even if it were relevant, Revels's comments reflect "frustration, irritation, and

23

possibly even anger," which are generally "not sufficient to penetrate official immunity." *Selvy v. Morrison*, 665 S.E.2d 702, 706 (Ga. Ct. App. 2008). Accordingly, we affirm the district court's grant of summary judgment on this claim.

## IV. Claims against Medical Defendants

Finally, Johnson asserts that the district court at trial erroneously instructed the jury that expert testimony was necessary to establish the element of causation for his medical-negligence claim that Nurse Fajardo administered the PPD test for tuberculosis without his consent. Because the "element of causation turned solely on a simple fact question of consent," Johnson argues, there was no need for expert testimony and the jury may have been misled by the instruction.

Rule 51, Fed. R. Civ. P., governs objections to jury instructions and preserving a claim of error for appeal. For an objection to be timely under Rule 51, it must be made "before the instructions and arguments are delivered." *See* Fed. R. Civ. P. 51(b)(2) & (c)(2)(A). "We interpret Rule 51 strictly, and require a party to object to a jury instruction or jury verdict form *prior* to jury deliberations in order to preserve the issue on appeal." *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1329 (11th Cir. 1999) (emphasis in original). That requirement ensures that the trial judge has an opportunity to correct any error before a jury has begun its deliberations. *Id.* "A party who fails to raise an objection to a . . . jury

instruction prior to jury deliberations waives its right to raise the issue on appeal," unless the appellant can satisfy plain-error review. *Id.*

Reversal for plain error in this context "will occur only in exceptional cases where the error is so fundamental as to result in a miscarriage of justice." *Id.* (internal quotation marks omitted) (emphasis omitted). The appellant must prove that the challenge instruction was an incorrect statement of law and that it likely affected the outcome of the proceedings. *See id.* at 1329–30. Moreover, "[w]e repeatedly have held that we will not find that a particular instruction constitutes plain error if the objecting party invited the alleged error by requesting the substance of the instruction given." *Id.* at 1331 (internal quotation marks omitted) (alteration adopted).

Plain-error review applies because Johnson did not timely object to the challenged instruction before the beginning of jury deliberations. *See id.* at 1329. And this is not an "exceptional case" in which "the error is so fundamental as to result in a miscarriage of justice." *Id.* For starters, Johnson's counsel appears to have jointly submitted the negligence instruction, and he expressly conceded that the instruction was an accurate statement of the law. Nor, upon first raising the issue, did counsel ask the court to take any corrective action. Such actions arguably amount to invited error.

More importantly, we agree with the medical defendants that the record gives no indication that the instruction had any prejudicial effect at trial. The verdict in favor of the medical defendants on the battery claim required the jury to find that Fajardo had not administered the test without Johnson's consent. *See Prince v. Esposito*, 628 S.E.2d 601, 603 (Ga. Ct. App. 2006) ("An action for battery arises in the medical context when a medical professional makes unauthorized contact with a patient during examination, treatment, or surgery. A patient who consents to a medical touching, however, cannot sustain a battery claim.") (footnotes and internal quotation marks omitted). That finding would likewise preclude Johnson from prevailing on his claim for medical negligence based on a lack of consent. Accordingly, Johnson has not established plain error based on an erroneous jury instruction.

## V. Conclusion

For the reasons stated, we affirm the grant of summary judgment to the County defendants (Revels, Bailey, Davis, and Sheriff Conway). We likewise affirm the judgment in favor of the medical defendants (Fajardo and Corizon).

**AFFIRMED.**